62 Cal.Rptr.3d 122 (2007)
152 Cal.App.4th 1439
Russell CHRISTOFF, Plaintiff and Respondent,
v.
NESTLÉ USA, INC., Defendant and Appellant.
No. B182880.
Court of Appeal of California, Second District, Division Eight.
June 29, 2007.
*125 Horvitz & Levy, David M. Axelrad, Jeremy B. Rosen, John A. Taylor, Jr., Encino; Heller & Edwards, Lawrence E. Heller, Beverly Hills, and Shula R. Barash, for Defendant and Appellant.
Law Offices of Colin C. Claxon, Colin C. Claxon, San Rafael; Mayer & Glassman Law Corp., Robert David Mayer, Los Angeles; Kibre & Horwitz, Eric G. Stockel, Beverly Hills; David J. Franklyn, for Plaintiff and Respondent.
COOPER, P.J.
"No social purpose is served by having the defendant get free some aspect of the plaintiff that would have market value and for which he would normally pay." (Zacchini v. Scripps-Howard Broadcasting Co. (1977) 433 U.S. 562, 576, 97 S.Ct. 2849, 53 L.Ed.2d 965.) That is what happened in this case. Nestlé USA, Inc. (Nestlé or appellant) used Russell Christoff's image on its Taster's Choice instant coffee label without Christoff's consent and without remuneration. A jury awarded Christoff $330,000 in damages and over 15 million dollars in profits.
Nestlé: argues that the jury verdict must be reversed because the cause of action was time barred. According to Nestlé, if the trial court correctly had applied the single-publication rule and a one-year statute of limitations, it would have concluded that the lawsuit filed six years after Nestlé first used Christoff's image was barred. "Under the single-publication rule, with respect to the statute of limitations, publication generally is said to occur on the `first general distribution of the publication to the public'" (Shively v. Bozanich (2003) 31 Cal.4th 1230, 1245, 7 Cal.Rptr.3d 576, 80 P.3d 676 (Shively).) Nestlé also argues that the profits award, which was based on Civil Code section 3344, must be reversed because (1) it did not knowingly use Christoff's image without his consent; (2) Christoff was not a celebrity, and (3) Christoff did not show the profits were attributable to the use of his likeness.[1]
*126 We hold that the single-publication rule applies to a cause of action under section 3344, and that a two year statute of limitations applies to a section 3344 cause of action. As a result, unless a reasonable person in Christoff's position had no meaningful ability to discover the publication, Christoff must have filed a lawsuit within two years of when Nestlé first published his image or republished his image. We also hold Nestlé knowingly used Christoff's image without his consent; section 3344 applies to Christoff even though he is not a celebrity; and Christoff failed to provide substantial evidence showing that the 15 million dollar profit award was attributable to the use of his image.
We reverse the judgment based on the jury verdict and remand the case to the trial court for further proceedings.

FACTUAL BACKGROUND
In 1986, Russell Christoff, who was then a professional model, posed gazing at a cup of coffee, as if he enjoyed the aroma. The photo shoot was arranged by Nestlé Canada.[2] Christoff was paid $250 for his time and received a contract governing the use of his image, which was signed by his agent and by Nestlé Canada (Contract). The Contract provided that, if Nestlé: Canada used the picture on a label it was designing for a brick of coffee, Christoff would be paid $2,000 plus an agency commission. The Contract also provided that the price for any other use of Christoff's image would require further negotiations. Without informing Christoff, or paying him according to the terms of the Contract, Nestlé Canada used Christoff's image on the coffee brick.
Eleven years later, in 1997, Nestlé decided to redesign its label for Taster's Choice instant coffee. For three decades, the Taster's Choice label prominently featured a "taster," that is a person peering into a cup of coffee. Amanda Steele, a Nestlé employee, explained that one goal of the redesign was to maintain the "taster" in order to retain continuity. Steele searched for high resolution artwork portraying the image of the original "taster," but was unable to locate any artwork that met the necessary specifications. Steele, however, found artwork portraying Christoff and it satisfied the requirements.
A decision was made to use Christoff's image because of his "distinguished" look and because he could create continuity with the original "taster" to whom the parties refer as Taster No. 1. Steele believed that she had authority to use Christoff's image because she knew it had been widely used in Canada. Steele never investigated the scope of the consent and never asked Christoff if he consented to the use of his image. Steele explained that "in talking to my colleague at Nestlé Canada, I believed that we had usage rights for the photo. So, I didn't think *127 there was any need to [contact Christoff]." Christoff's image was used in the redesigned Taster's Choice label beginning in 1998. Only a portion of Christoff's face is visible and the picture is cropped just above the eyebrows. The redesigned label was used on several different Taster's Choice jars, including regular coffee, decaffeinated, and various flavors. Labels bearing Christoff's image also were produced in different languages to be sold internationally. For the label to be placed on jars sold in Mexico, Christoff's image was altered to add sideburns and darken his complexion. Jars of coffee bearing Christoff's image were included in Nestlé's multiple advertising campaigns for Taster's choice, including transit ads, coupons in newspapers, magazine advertisements, and Internet advertisements.
On June 4, 2002, Christoff discovered the use of his picture when he was shopping at a Rite Aid store and happened to see a can of Taster's Choice instant coffee.[3]
In 2003, Nestlé again redesigned its label using another model, James Vaccaro, as the "taster." Vaccaro was paid $150,000 for the use of his image for 10 years. The new label started circulating in May 2003, but jars of Taster's Choice with Christoff's image were still in Nestlé's inventory and could have been shipped to retailers.

PROCEDURAL BACKGROUND
In 2003, Christoff sued Nestlé, alleging causes of action for violation of section 3344, common law appropriation of likeness, quantum meruit (initially labeled "quasi-contract"), and unjust enrichment. The trial court denied Nestlé's motion for summary judgment based on the statute of limitations. The court applied a two-year statute of limitations under Code of Civil Procedure section 339. The court further concluded that the jury must determine whether Christoff knew or should have known Nestlé used his image prior to his discovery in June 2002. The trial court also denied Nestlé's motion for summary adjudication, in which it asserted that there was no evidence it knowingly used Christoff's photograph without his consent.
At trial, Nestlé vigorously objected to the testimony of Christoff's damage expert, Peter Sealy. Sealy's testimony detailed his opinion that the icon on the Taster's Choice label was responsible for five to 15 percent of Nestlé's profits from selling Taster's Choice instant coffee. This testimony was the basis for Christoff's argument that he was entitled to 10 percent of Nestlé's profits from the sale of Taster's Choice instant coffee. Christoff's accounting expert testified that, during the six-year period Nestlé used Christoff's likeness, Nestlé's total profits from Taster's Choice were $531,018,000 and, based on Sealy's testimony, Christoff was entitled to $53,101,800.
Joseph Hunter, a former partner at Ford Models, a prominent modeling agency, also testified as an expert for Christoff. According to Hunter, a model generally charges a day rate for a photo shoot and a usage fee for different uses such as packaging, billboards and transit. He valued the use of Christoff's photograph for a six-year period at $1,475,000. In addition to the six-year time period, Hunter assumed that the photo was used "in virtually all kinds of media that existed."[4] He acknowledged *128 that Vaccaro received $150,000 for the use of his image for a 10-year period but explained that $150,000 is a very low fee.
At the close of Christoff's case, the court granted Nestlé's nonsuit motion on the issue of punitive damages. The court found no evidence of malice.
The jury concluded as follows: (1) Nestlé knowingly used Christoff's photograph or likeness on the Taster's Choice labels for commercial purposes without Christoff's consent; (2) Prior to 2002, Christoff did not know and should not have known or reasonably suspected that his photograph was being used for commercial purposes; (3) Christoff suffered $330,000 in actual damages; (4) The profits attributable to the use of Christoff's photograph or likeness were $15,305,850; (5) The damages for the common law appropriation claim were $330,000 and for the quantum meruit claim were $15,635,850. The trial court subsequently granted Christoff's motion for attorney fees. Nestlé appealed from the judgment and the order awarding costs and attorney fees.[5]

DISCUSSION
This appeal raises four primary questions: (1) Does the single-publication rule (SPR) apply to a cause of action for appropriation; (2) What are the implications of applying the SPR to an appropriation cause of action; (3) Did Christoff prove his cause of action under section 3344; and (4) Did Christoff establish he was entitled to profits under section 3344?
We begin, in part I, with a discussion of the development of the right of publicity. Its historical roots are significant in the analysis of whether the right of publicity falls within the SPR and which statute of limitations applies to a cause of action asserting a violation of the right of publicity.
In part II, we consider the SPR in the context of Nestlé's argument that Christoff's claims are barred by the statute of limitations. According to Nestlé, by virtue of the SPR, Christoff was required to file a lawsuit one year after it first published his likeness, i.e. in 1998. Christoff did not file his lawsuit until 2003. Christoff argues that the SPR does not apply to right of publicity claims; instead a two-year statute of limitation rule governs, and substantial evidence supported the jury's finding that his claims did not accrue until 2002 when he first discovered the unlawful use of his likeness.
*129 To resolve these issues, we first consider whether the SPR applies to a cause of action for appropriation. We discuss the background of the SPR, the language of the statute and conclude that based on the plain language of the statute and its uniform broad application to various tort causes of action, the SPR is applicable to Christoff's causes of action for appropriation. Although Christoff identifies substantial competing policy considerations, his arguments are not persuasive, as we explain in part II, subpart B.
Our conclusion that the SPR is applicable takes us to the third key question and requires us to consider the following related issues, which we discuss in part III:(1) is the SPR compatible with the discovery rule; (2) were there republications of Christoff's image triggering additional causes of action, and (3) what statute of limitations applies to Christoff's appropriation causes of action? To resolve these issues, we review the SPR in analogous areas of the law and consider its application to misappropriation of likeness claims. We then analyze whether the delayed discovery rule applies to this case and whether a one-year or two-year statute of limitations controls.
In part IV, we consider Nestlé's arguments that section 3344 does not apply. Nestlé argues that it did not knowingly use Christoff's image and that Christoff is not a celebrity. We reject Nestlé's statutory construction and hold that section 3344 is applicable.
Given that section 3344 is applicable, we next consider whether Christoff established the requirements of that statute to recover profits. Nestlé argues that the damage award is not supported by substantial evidence. Christoff argues that the testimony of his expert, Peter Sealy, amply supports the award. In part V, we summarize the testimony of Sealy and conclude substantial evidence does not show the profits were attributable to the use of Christoff's likeness as required by section 3344.
In part VI, we discuss the remaining issues raised by the parties including whether Christoff was entitled to the $15,635,850 quantum meruit recovery awarded by the jury and whether the attorney fee award must be reversed in light of our other holdings. Lastly, in part VII, we give guidance to the trial court for remand.

I. The Right of Publicity Derives from the Right of Privacy
Common law provided some protection from the unauthorized use of a person's likeness. This appropriation was understood as a violation of a person's right of privacy, just as the intrusion on a person's solitude, the disclosure of private facts, and the placement of a person in a false light were considered invasions of privacy. (Rest.3d Unfair Competition, § 46, com. b, p. 528; see also Motschenbacher v. R.J. Reynolds Tobacco Company (9th Cir.1974) 498 F.2d 821, 823-825.)[6] In 1971, when the Legislature complemented the common law tort of appropriation by adding a statutory cause of action, the invasion of *130 privacy classification predominated. (See Lugosi supra, 25 Cal.3d at p. 842, 160 Cal.Rptr. 323, 603 P.2d 425, fn. 23 ["The Legislature recently enacted Civil Code Section 3344 to provide a minimum amount of damages where an unauthorized commercial appropriation constitutes an invasion of privacy"]; Assem. Com. on Judiciary, Analysis of Assem. Bill No. 826 (1971 Reg. Sess.) as amended May 21, 1971 ["Invasion of Privacyprohibits unauthorized commercial use of name, photo or likeness"].)
Although the other invasions of privacy protected an individual's peace and quiet, the appropriation tort protected an economic interest. (Lugosi, supra, 25 Cal.3d at pp. 833-834, 160 Cal.Rptr. 323, 603 P.2d 425 (dis. opn. of Bird, C.J.); see also Rest.3d Unfair Competition, § 46, com. b, p. 528.) "When one makes an unauthorized use of another's identity for his own commercial advantage, he is unjustly enriched, having usurped both profit and control of that individual's public image." (Lugosi supra, 25 Cal.3d at p. 839, 160 Cal.Rptr. 323, 603 P.2d 425 (dis. opn. of Bird, C.J.); see also Rest.3d Unfair Competition, § 46, com. c, p. 528.) Eventually, courts recognized anomalies created by lumping the appropriation tort in the "invasion of privacy" category. For example, the celebrity plaintiff could not recover from the use of his or her likeness because the celebrity did not suffer an injury to his or her solitude. (See Rest.3d Unfair Competition, § 46, com. b, p. 528; Gionfriddo v. Major League Baseball (2001) 94 Cal. App.4th 400, 409, 114 Cal.Rptr.2d 307.) In addition, in California, the Supreme Court held that privacy rights were not descendible because the right is personal.[7] (Lugosi supra, 25 Cal.3d at p. 824, 160 Cal.Rptr. 323, 603 P.2d 425; see also Rest.3d Unfair Competition § 46, com. b, p. 528.) Eventually, the appropriation tort became better known as the "right of publicity."
In its earliest formulation, the right of publicity meant that "a man has a right in the publicity value of his photograph." (Haelan Laboratories v. Topps Chewing Gum (2nd Cir.1953) 202 F.2d 866, 868.) "For it is common knowledge that many prominent persons (especially actors and ball-players), far from having their feelings bruised through public exposure of their likenesses, would feel sorely deprived if they no longer received money for authorizing advertisements, popularizing their countenances, displayed in newspapers, magazines, busses, trains and subways." (Ibid.) Our high court explained the "right of publicity means in essence that the reaction of the public to name and likeness, which may be fortuitous or which may be managed or planned, endows the name and likeness of the person involved with commercially exploitable opportunities." (Lugosi supra, 25 Cal.3d at p. 824, 160 Cal. Rptr. 323, 603 P.2d 425.)
The right of publicity protects "`the very identity or persona of the plaintiff as a human being,'" not the particular photograph of the plaintiff. (Downing v. Abercrombie & Fitch (9th Cir.2001) 265 F.3d 994, 1004, quoting McCarthy, Rights of Publicity and Privacy (1997) § 11.13[C] at 11-72-73; see also KNB Enterprises v. Matthews (2000) 78 Cal.App.4th 362, 365, 92 Cal.Rptr.2d 713.) The protection of a person's name or likeness has some parallels to federal copyright law. (Zacchini v. Scripps-Howard Broadcasting Co., supra, 433 U.S. at p. 573, 97 S.Ct. 2849.) But the Copyright Act (17 U.S.C. § 101) protects pictorial, graphic, and sculptural works, *131 including photographs, not the name, identity or persona of the plaintiff. (Downing v. Abercrombie & Fitch, supra, 265 F.3d at p. 1004.) Both the Copyright Act and the right of publicity protect "a form of intellectual property that society deems to have some social utility." (Comedy III Productions, Inc. v. Gary Saderup, Inc. (2001) 25 Cal.4th 387, 399, 106 Cal.Rptr.2d 126, 21 P.3d 797.)

II. The Single-Publication Rule Applies to Christoff's Appropriation Causes of Action
Although we find no published California case that has squarely addressed this issue, we conclude that the SPR applies to the right of publicity. This conclusion is supported by the broad language of section 3425.3, the broad application of the statute in the case law, and the history of the right of publicity. The SPR, adopted in California in 1955 and codified in section 3425.3, provides: "No person shall have more than one cause of action for damages for libel or slander or invasion of privacy or any other tort founded upon any single publication or exhibition or utterance, such as any one issue of a newspaper or book or magazine or any one presentation to any audience or any one broadcast over radio or television or any one exhibition of a motion picture. Recovery in any action shall include all damages for any such tort suffered by the plaintiff in all jurisdictions." [8]
By enacting the SPR, the Legislature sought to resolve the potentially overwhelming number of lawsuits arising from a single defamatory statement and the potentially endless tolling of the statute of limitations. The definition of defamation permitted a separate cause of action for each publication of a statement which occurred each time the statement was communicated to a third person who understood its defamatory meaning. (Shively v. Bozanich, supra, 31 Cal.4th at p. 1243-1244, 7 Cal.Rptr.3d 576, 80 P.3d 676.) To avoid unwieldy litigation requiring application of the laws of multiple jurisdictions based on each separate publication, the SPR creates a legal fiction. It deems one issue of a publication to be one single publication regardless of whether an issue consists of one copy, one million, or more. (Shively, supra, 31 Cal.4th at pp. 1242-1243, 7 Cal.Rptr.3d 576, 80 P.3d 676.)

A. The Plain Language of Section 3425.3
Although the tort of defamation provided the catalyst for the SPR, the SPR is broadly worded. By its plain language, the statute applies to causes of action for "invasion of privacy" and "any other tort founded upon any single publication or exhibition or utterance." (§ 3425.3.) At the time the SPR was adopted, the common law tort of appropriation was classified as an "invasion of privacy." In Fairfield v. American Photocopy Etc. Co. (1955) 138 Cal.App.2d 82, 85, 291 P.2d 194, the defendant improperly used the plaintiffs name in an advertisement for a photocopy machine. The court explained that: "The exploitation of another's personality for commercial purposes constitutes one of the most flagrant and common means of invasion of privacy." (Id, at p. 86, 291 P.2d 194.) "The desire of a business concern for publicity or advertising does not justify its invasion of the right of privacy." (Id. at p. 87, 291 P.2d 194.) Even though the tort of appropriation is now more commonly referred to as a "right of publicity," its *132 initial classification as a "right of privacy" places it squarely within the ambit of the SPR, which was enacted in 1955.
But even if the tort of appropriation were not understood as an "invasion of privacy" at the time the SPR was enacted, it falls within the "any other tort" language of the SPR. Relying on this broad language, courts have held the SPR applies to many different types of lawsuits, including personal injury, civil rights, fraud and deceit. (M.G. v. Time Warner, Inc. (2001) 89 Cal.App.4th 623, 630, 107 Cal.Rptr.2d 504; Strick v. Superior Court (1983) 143 Cal.App.3d 916, 923-924, 192 Cal.Rptr. 314; Pitts v. City of Kankakee, Ill. (7th Cir.2001) 267 F.3d 592, 597.) As explained in Khaury v. Playboy Publications, Inc. (S.D.N.Y.1977) 430 F.Supp. 1342, 1346, a case applying a similar New York statute: "It would appear that the rule [SPR], then, is not aimed at the particular tort alleged, but rather at the manner in which the tort is executed. If the wrong arises out of a mass communication, then whether it sounds in defamation or statutory invasion of privacy, the same considerations should apply." (Id. at p. 1345.) "`When the Legislature inserted the clause "or any other tort" it is presumed to have meant exactly what it said.'" (Baugh v. CBS, Inc. (N.D.Cal. 1993) 828 F.Supp. 745, 756.)
Use of the phrase "any other tort" signals the Legislature intended broad application of the SPR. Section 3344 and the common law tort of appropriation necessarily include publications as each requires the use of another person's name, likeness, voice, or signature. To violate section 3344, the person's name or likeness must be used "for purposes of advertising or selling, or soliciting purchases of, products, merchandise, goods or services, ..." (§ 3344, subd. (a).)
The policies underlying the SPR apply to this case. Just as in a defamation case, the litigation would have become unwieldy and potentially endless with every coffee can, print, television, and electronic advertisement generating a separate cause of action. Indeed, Christoff alleges in his complaint, "Based upon the amount of product in the stream of commerce, the Use of Plaintiffs Picture is likely to continue indefinitely." With indefinite use, there could be indefinite litigation. That is exactly the scenario the SPR was designed to avoid.

B. Christoff's Arguments that the SPR Is Inapplicable to His Appropriation Causes of Action
As explained above, the plain language of section 3425.3 indicates that it applies to Christoff's appropriation causes of action. Christoff vigorously challenges this conclusion, but his arguments on the inapplicability of the SPR are not persuasive. First, he argues his "claim is not one based upon a communicative act, such as a publication, exhibition or utterance, as envisioned by the SPR." This argument is easily disposed of given that Christoff's entire case is based on his claim that Nestlé used his image "for the purpose of advertising, selling and/or soliciting purchases" of Nestlé's products. The purpose of advertising is to persuade a consumer to purchase a particular product (Eastwood v. Superior Court (1983) 149 Cal.App.3d 409, 420, 198 Cal. Rptr. 342), which by definition is a communicative act. This is not a case where the alleged wrong constitutes a physical intrusion or some other noncommunication based tort. (See Baugh v. CBS, Inc., supra, 828 F.Supp. at p. 756.)
Second, Christoff attempts to distinguish the coffee can from the newspaper, book or magazine, radio, television, or movie specifically referred to in the SPR. *133 Yet, he also argues that his image was used in television commercials, on the Internet, and in newspaper and magazine advertisements. His expert testified that Christoff was entitled to compensation for the use of his image in "virtually all kinds of media that existed."
Aside from the fact that this case does involve the use of Christoff's image in newspapers and magazines, the SPR is not limited to newspapers, books, magazines, radio, television, and movies. For example, it has been applied to the Internet. (Traditional Cat Assn., Inc. v. Gilbreath (2004) 118 Cal.App.4th 392, 394, 13 Cal. Rptr.3d 353.) "[T]he need to protect Web publishers from almost perpetual liability for statements they make available to the hundreds of millions of people who have access to the Internet is greater even than the need to protect the publishers of conventional hard copy newspapers, magazines and books." (Id. at p. 404, 13 Cal. Rptr.3d 353.) The SPR's use of the phrase "such as" indicates that the enumerated list of mediums is not exclusive but exemplary.
Third, Christoff makes much of the distinction between the right of privacy and the right of publicity, emphasizing that each protects a distinct interest. The right of privacy protects from damage to a person's feelings based on an unauthorized use, and, what is now referred to as the "right of publicity" protects the person's commercial value in his or her identity. (KNB Enterprises v. Matthews, supra, 78 Cal.App.4th at p. 366, 92 Cal.Rptr.2d 713.) But, as explained above, at the time the SPR was adopted, the Legislature expressly stated the SPR applied to the invasion of privacy, which included the tort of appropriation.
In any event, reliance on the type of damage for the application of the SPR is misplaced as explained in Long v. Walt Disney Co. (2004) 116 Cal.App.4th, 868, 10 Cal.Rptr.3d 836. In that case, the plaintiffs argued that the use of their likeness on a television program was not subject to the SPR because the claimed damages were based on emotional distress and not the loss of their reputation. (Long v. Walt Disney Co., supra, 116 Cal.App.4th at pp. 872-873, 10 Cal.Rptr.3d 836.) The court instead focused on the manner the tort was committed: "Plaintiffs do not, and cannot, dispute that each of the claims before the court sounds in tort and arises from the broadcasts and related Internet activity." (Id. at p. 873, 10 Cal.Rptr.3d 836.) The SPR "`is not aimed at the particular tort alleged, but rather at the manner in which the tort is executed.'" (Strick v. Superior Court, supra, 143 Cal. App.3d at p. 924, 192 Cal.Rptr. 314.) Here, the alleged wrong is the mass publication of Christoff's likeness. That manner of violating section 3344 falls within the ambit of the SPR.
Strick v. Superior Court, supra, 143 Cal. App.3d 916, 192 Cal.Rptr. 314 is equally unhelpful to Christoff. While the court found the harm alleged for causes of action for fraud and deceit was identical to the harm caused by libel, it did not hold that the SPR applies only where the injury is to a person's reputation. Instead, it held the petitioners could not circumvent the SPR by stylizing their claims as fraud and deceit when the loss was identical to that for libel. (Strick v. Superior Court, supra, 143 Cal.App.3d at p. 925, 192 Cal.Rptr. 314.) By stating that the SPR applied to the causes of action for fraud and deceit because the harm was identical to that for libel, the court did not decide whether the SPR could also apply when different damages were alleged.
Next, Christoff points out that when the Legislature enacted section 3344, it proposed but abandoned a modification to section *134 3425.3 to include expressly an advertisement, circular or solicitation within the SPR. (Assem. Bill No. 826 (1971 Reg. Sess.) as amended June 16, 2001.) This observation does not advance Christoff's contentions. The ambiguity in the legislative history does not elucidate whether the Legislature determined that the broad language of the SPR did not require further enumeration or specifically rejected the notion that an advertisement, circular, and solicitation should be included within the ambit of the SPR. The abandonment of this proposed legislation therefore does not assist in interpreting the language of the SPR. The unpassed bill supports contrary inferences and therefore provides no guidance in interpreting the SPR. "`"The light shed by such unadopted proposals is too dim to pierce statutory obscurities. As evidence of legislative intent they have little value. [Citations.]"'" (Grupe Development Co. v. Superior Court (1993) 4 Cal.4th 911, 923, 16 Cal.Rptr.2d 226, 844 P.2d 545.)

III. The Implications of Applying the SPR to Christoff's Appropriation Causes of Action
The trial court concluded that the SPR was inapplicable to Christoff's appropriation causes of action. Because we conclude the SPR does apply, we must further consider: (1) whether the discovery rule is applicable; (2) the meaning of the term "republication" as it is used in the context of the SPR, and (3) what statute of limitations governs.

A. The Discovery Rule
Even though section 3425.3 does not make reference to the accrual date of a cause of action, where the SPR applies, a cause of action has been held to accrue from the date "of the first general distribution of the publication to the public." (Shively, supra, 31 Cal.4th at p. 1245, 7 Cal.Rptr.3d 576, 80 P.3d 676.) The discovery rule is an equitable principle, which protects a plaintiff from an earlier accrual of a cause of action. (Moreno v. Sanchez (2003) 106 Cal.App.4th 1415, 1423, 131 Cal. Rptr.2d 684.) When the discovery rule applies, a cause of action accrues when the plaintiff "`discovers or should have discovered all the facts essential to his cause of action.'" (Ibid.) Once it found the SPR inapplicable, there was no need for the trial court here to have considered the intersection of the SPR and the discovery rule. The trial court simply applied the discovery rule and asked the jury to consider when Christoff discovered the use of his likeness.
The joint jury instructions included the following instruction: "The Court has determined that the statute of limitations for Mr. Christoff's claims under Civil Code Section 3344 is two years. Mr. Christoff filed his Complaint on February 7, 2003, meaning that he may claim damages that took place at any time on or after February 7, 2001. [¶] In addition, if you find that the rule of delayed discovery applies, then Mr. Christoff may also seek damages that took place from the time Nestlé USA first used his image. In order to establish a delayed discovery Mr. Christoff bears the burden of proving that: (a) prior to his discovery of the facts he did not previously suspect, or should have suspected, that his photograph was on the Taster's Choice label; and (b) he had no notice or information of circumstances which would have put a reasonable person on inquiry despite the exercise of reasonable diligence that his photograph was on the Taster's Choice label."
The jury concluded Christoff did not know and he should not have known or suspected "by exercising reasonable diligence, that his photograph or likeness was *135 being used by Defendant for commercial purposes before June 2002."

i. Shively v. Bozanich (2003) 31 Cal.4th 1230

In Shively, the Supreme Court considered the intersection of the SPR and the discovery rule in the context of a defamation cause of action. Where a defamation is made public, "[u]niform authority establishes that the discovery rule does not apply to delay the accrual of a cause of action for a defamation contained in such a publication." (Shively, supra, 31 Cal.4th at p. 1237, 7 Cal.Rptr.3d 576, 80 P.3d 676.) "Under the single-publication rule, with respect to the statute of limitations, publication generally is said to occur on the `first general distribution of the publication to the public'" (Id. at p. 1245, 7 Cal. Rptr.3d 576, 80 P.3d 676; see also Cusano v. Klein (9th Cir.2001) 264 F.3d 936, 950 [applying the single-publication rule to a claim for infringement of the right of publicity].) "[A]pplication of the discovery rule would undermine the protection provided by the single-publication rule." (Shively, supra, 31 Cal.4th at p. 1250, 7 Cal.Rptr.3d 576, 80 P.3d 676.)
However, that general rule is not absolute. "[I]n certain circumstances it may be appropriate to apply the discovery rule to delay the accrual of a cause of action for defamation or to impose an equitable estoppel against defendants who assert the defense after the limitations period has expired." (Shively, supra, 31 Cal.4th at pp. 1248-1249, 7 Cal.Rptr.3d 576, 80 P.3d 676.) The discovery rule "has been applied when the defamatory statement is hidden from view as, for example, in a personnel file that generally cannot be inspected by the plaintiff. The rationales offered in support of the application of the discovery rule to defamation cases are equitable in nature. The cases turn upon the circumstances in which the defamatory statement is made and frequently involve a defamatory writing that has been kept in a place to which the plaintiff has no access or cause to seek access." (Id. at p. 1249, 7 Cal.Rptr.3d 576, 80 P.3d 676.) "The plaintiffs inability to discover the libel when it first was `published' and placed in a confidential file would render unjust any holding that the cause of action accrued and the period of limitations commenced when the writing was placed in the file." (Ibid.)
Shively cites Manguso v. Oceanside Unified School Dist. (1979) 88 Cal.App.3d 725, 152 Cal.Rptr. 27 as an example of this principle. (Shively, supra, 31 Cal.4th at p. 1249, 7 Cal.Rptr.3d 576, 80 P.3d 676.) In Manguso v. Oceanside Unified School Dist, supra, 88 Cal.App.3d at pp. 730-731, 152 Cal.Rptr. 27, the court held that the discovery rule applied to a defamation cause of action brought by a school teacher against a school principal for libel based on a letter he caused to have placed in her permanent personnel file. (Ibid.) Thus, the application of the discovery rule differs depending on whether the defamation was hidden from view or made in a public document. (Ibid; see also Long v. Walt Disney Co., supra, 116 Cal.App.4th at p. 875, 10 Cal.Rptr.3d 836; McGuiness v. Motor Trend Magazine (1982) 129 Cal. App.3d 59, 63, fn. 2, 180 Cal.Rptr. 784.) Although Shively explains the general incompatibility of the single-publication rule and the discovery rule, it sanctions the application of the discovery rule under narrow circumstances.

ii. Application of Shively to a Cause of Action for Appropriation

The trial court's application of the discovery rule flowed logically from its decision that the SPR did not apply to Christoff's appropriation causes of action. However, because we conclude that the SPR is applicable, as explained in Shively, *136 the discovery rule generally does not apply. Nevertheless, just as in the defamation context, "in certain circumstances it may be appropriate to apply the discovery rule to delay the accrual of a cause of action ... or to impose an equitable estoppel against defendants who assert the defense after the limitations period has expired." (Shively, supra, 31 Cal.4th at pp. 1248-1249, 7 Cal.Rptr.3d 576, 80 P.3d 676.)
Although generally an advertising or marketing campaign is not confidential, the record does not indicate the initial distribution or use of Christoff's likeness. The record does not show whether Christoff lacked a meaningful ability to discover the use of his likeness. (See Shively, supra, 31 Cal.4th at p. 1249, 7 Cal.Rptr.3d 576, 80 P.3d 676 ["The plaintiffs inability to discover the libel when it first was 'published' and placed in a confidential file would render unjust any holding that the cause of action accrued and the period of limitations commenced when the writing was placed in the file"].) Christoff did not argue that Nestlé hindered his discovery of the use of his likeness. (Bernson v. Browning-Ferris Industries (1994) 7 Cal.4th 926, 931-932, 30 Cal.Rptr.2d 440, 873 P.2d 613 ["under the discovery rule, however, the date of accrual may be delayed where the defendant's actions hinder plaintiffs discovery of the defamatory matter"].) But there was no basis for Christoff to provide evidence of Nestlé's conduct, because the trial court concluded the discovery rule applied absent such evidence.
If a reasonable person in Christoff's position had a meaningful ability to discover the violation, applying the discovery rule "would violate the principal policy that underlies the [single-publication] rule." (Long v. Walt Disney, supra, 116 Cal.App.4th at p. 875, 10 Cal.Rptr.3d 836.) In contrast, if a reasonable person in Christoff's position had no meaningful opportunity to discover the violation, it would be unfair to hold that the cause of action accrued when the covert publication occurred. (See Shively, supra, 31 Cal.4th at p. 1249, 7 Cal.Rptr.3d 576, 80 P.3d 676.) We cannot resolve this question on appeal because the jury was asked to apply an incorrect standard.[9]

B. "Republication" as Used in Connection With the SPR
The SPR restricts to a single cause of action all damages founded upon a *137 "single publication." A "single publication" is distinguished from a "republication." If a defendant republishes material, the protection under the SPR does not apply. (Kanarek v. Bugliosi (1980) 108 Cal.App.3d 327, 332, 166 Cal.Rptr. 526.) A new edition or new issue constitutes a new publication giving rise to a separate cause of action. (Shively, supra, 31 Cal.4th at p. 1245, fn. 7, 7 Cal.Rptr.3d 576, 80 P.3d 676.) Thus, the distinction between a single publication and a republication becomes critical in assessing the date of the accrual of a cause of action. The trial court dodged the republication quagmire by concluding the SPR was inapplicable.
Christoff argues that the following constitute republications: (1) labels on jars for eight different flavors and one variety pack; (2) labels on different size jars; (3) variation in label design showing different amounts of Christoff's face; (4) variation on other aspects of the label; (5) labels in each of 21 foreign countries; (6) use in magazines, newspapers, distributed coupons, and ads by third-party vendors; (7) television advertisements; (8) Web site advertisements; (9) downloads as screen saver or post it note or recipe; and (10) bus, subway, and rapid transit advertisements in Chicago, New York and San Francisco.

i. Definitions of Republication
The meaning of the term "republication" is critical to assessing whether Christoff is limited to one cause of action or can assert multiple causes of action for the use of his likeness. Application of the term "republication" occurs in various mediums and contexts. Under California law, it is clear that the publication of a paperback edition of a book previously published in hardback constitutes a republication. (Kanarek v. Bugliosi supra, 108 Cal.App.3d 327, 333, 166 Cal.Rptr. 526.) The paperback version "was undoubtedly intended to and did reach a new group of readers." (Ibid.) Other courts also have held that publishing a book in paperback form constitutes a republication of a hardback book. (Rinaldi v. Viking Penguin, Inc. (1979) 101 Misc.2d 928, 934, 422 N.Y.S.2d 552.) "Viking's decision to release The Abuse of Power in paperback was a conscious attempt to reach an entirely new market of readers through a different format at a different price." (Ibid.) In addition, Viking made other alterations to the form including changing the name of the publisher, the date of publication and the copyright page. (Id. at p. 932, 422 N.Y.S.2d 552.) The books had been "substantially modified" when they were released at a subsequent date in paperback form. (Id. at p. 934, 422 N.Y.S.2d 552.)
In California, different editions of a newspaper constitute a single publication. (Belli v. Roberts Brothers Furs (1966) 240 Cal.App.2d 284, 49 Cal.Rptr. 625.) In contrast, a federal district court in the District of Columbia stated that "subsequent publications of the same material, such as new editions of a newspaper or book, or rebroadcast of a television program, are new publications triggering a new cause of action and commencing a new limitations period." (Foretich v. Glamour (D.D.C. 1990) 741 F.Supp. 247, 253.) Another court has held that a syndicated column is a single integrated publication regardless of the number of newspapers that carry it. (Givens v. Quinn (W.D.Mo.1994) 877 F.Supp. 485, 490.)
With respect to television shows, courts have reached different conclusions regarding the meaning of a republication. A New York court has held the rebroadcast of a television show constitutes a republication, even where there are no changes to the content of the show. (Lehman v. Discovery Communications, Inc. (E.D.N.Y. 2004) 332 F.Supp.2d 534.) The court reasoned *138 as follows: "Like a publication of the same defamatory statement in both a morning and evening editions of a newspaper, a rebroadcast of a television show is intended to reach a new audience and is therefore an additional communication." (Id, at p. 539.) Lehman conflicts with the holding of a federal court applying Michigan law. That court concluded that a rerun of The Oprah Winfrey Show did not constitute a republication. (Nichols v. Moore (E.D.Mich.2004) 334 F.Supp.2d 944, 953.) Nichols also held that the release of a film on DVD constitutes a republication. (Id. at p. 952.) The DVD contained special features not included in the movie's theatre run and was intended to reach a new audience. (Id. at p. 953.)
Courts consistently have applied the SPR to the dissemination of libel over the Internet and have considered the meaning of republication in that context. The modification to a Web site does not constitute a republication. (Firth v. State of New York (2002) 98 N.Y.2d 365, 371, 747 N.Y.S.2d 69, 775 N.E.2d 463.) "The mere addition of unrelated information to a Web site cannot be equated with the repetition of defamatory matter in a separately published edition of a book or newspaper...." (Ibid.) A modification that did not amount to a substantive change to a Web site did not constitute a republication. (Atkinson v. McLaughlin (D.N.D.2006) 462 F.Supp.2d 1038, 1055.) Accessing a comment on a subscription only Web site does not constitute a republication. (Rare 1 Corp. v. Moshe Zwiebel Diamond Corp. (2006) 13 Misc.3d 279, 822 N.Y.S.2d 375, 378.) Updates to a Web site do not constitute a republication where the updates do not alter the substance. (Churchill v. State (2005) 378 N.J.Super. 471, 483, 876 A.2d 311.) However, under the federal Privacy Act, the publication of the same information under a different URL address constitutes a separate violation. (Oja v. U.S. Army Corps of Engineers (9th Cir.2006) 440 F.3d 1122, 1133-1134.)
Cases discussing advertising, more analogous to the present case, are fewer in number. In Nelson v. Working Class, Inc. (S.D.N.Y Apr. 18, 2000, No. 99 Civ. 8854 HB), 2000 WL 420554, the district court applied the SPR and found that the plaintiffs' suit, filed two years after a commercial first aired, was untimely regardless of the number of times the commercial played. In Zoll v. Jordache Enterprises Inc. (S.D.N.Y. Apr. 24, 2003, No. 01 Civ. 1339(CSH)), 2003 WL 1964054, the court found the plaintiffs lawsuit to be barred even though Jordache repeatedly used her image, allegedly without her authorization, to advertise Jordache jeans. The commercial first aired in 1978 and then was re-released in 2000. "[T]he fact that a subsequent publication is the product of a conscious decision to republish and is intended to reach a new audience is but one of a number of factors considered in determining whether a subsequent publication constitutes a republication." (Zoll v. Jordache Enterprises Inc., supra, 2003 WL 1964054 at p. 2.) Because there was no modification to the original publication, the court found it did not constitute a republication.
Blair v. Nevada Landing Partnership (2006) 369 Ill.App.3d 318, 307 Ill.Dec. 511, 859 N.E.2d 1188 is the case most similar to the present one. Blair's photograph was used as part of an advertising campaign by the Buckingham Steakhouse, his employer. His photo was used in brochures, on signs, billboards, menus, calendars and postcards. (Id. at p. 320, 307 Ill.Dec. 511, 859 N.E.2d 1188.) It also appeared on the steakhouse's Web site. (Ibid.) When Blair left his employment, he requested the restaurant stop using his photo in its promotional, materials.
*139 The court applied the SPR to Blair's claim for common law and statutory appropriation of one's likeness. The court found the multiple uses of the picture to constitute a single act. (Blair v. Nevada Landing Partnership, supra, 369 Ill.App.3d at p. 324, 307 Ill.Dec. 511, 859 N.E.2d 1188.) "The plaintiffs picture, although it was displayed via several mediums over a period of time, was used for a single purpose, to advertise the Buckingham Steakhouse, and targeted a single audience, casino patrons." (Ibid.) "Furthermore, during that time [from 1995 to 2004], the plaintiffs image remained constant and was not significantly altered to reach a new audience. A single photograph was used from the photo shoot. Although the selected photograph was displayed via several mediums, such as billboards, brochures, flyers, menus, calendars, and postcards, it was displayed predominately within the casino and to existing casino customers." (Id. at p. 326, 307 Ill.Dec. 511, 859 N.E.2d 1188.)

ii. Analysis of "Republication" in This Case
Although the case law is not entirely consistent, the key factors in establishing a republication include: (1) that the republication was directed to a new, different audience and (2) that the original publication was modified. Here, to demonstrate a republication, Christoff would have to show, for example, that there was some modification to the presentation of his likeness or that it was intended to reach a new audience.
Upon remand, the trial court must determine whether there is sufficient evidence of republication to submit the issue to the jury. While Christoff's image was used in television advertisements, Web site advertisements, newspaper coupons, and rapid transit advertisements, ultimately it is a factual issue whether these uses were part of an original mass marketing campaign or part of incremental publications designed to appeal to different audiences. If, for example, Nestlé introduced Christoff's image simultaneously throughout the country and internationally, this case would be similar to Blair, in which a single audience was targeted. On the other hand, if Nestlé used Christoff's image only in one state, followed by another, there may be a describable difference in the audience sufficient to constitute a republication. The issue cannot be resolved based on the record on appeal. The examples are illustrative, not exhaustive as the resolution of the issue will depend on evidence presented by the parties upon remand.
Similarly, variations in the use of Christoff's image would be relevant to the republication. The record does reveal some modifications to the Christoff image as used by Nestle. A modification to the size of the jar is appears less likely to constitute a republication. More likely is the "[L]atinized" photograph used on cans of coffee sold in Mexico differs from the original image of Christoff used by Nestlé. The "[L]atinized" image includes more of Christoff's face and alters his face by adding sideburns and darkening his complexion. However, because the parties did not have an opportunity to develop these issues in the trial court, we decline to address them at this stage of the proceedings.

C. Statute of Limitations
Both the SPR and the republication issues implicate the statute of limitations. The parties dispute the applicable statutory period, an issue complicated by the initial understanding of the appropriation of one's likeness as an invasion of privacy and the current understanding of that tort as the right to publicity. Nestlé *140 argues that the one-year statute of limitations in Code of Civil Procedure section 340 is applicable. Christoff and the trial court instead applied the two-year statute in Code of Civil Procedure section 339.
In Johnson v. Harcourt, Brace, Jovanovich, Inc. (1974) 43 Cal.App.3d 880, 894-896, 118 Cal.Rptr. 370 (Johnson), the court held the one-year statute of limitations in former Code of Civil Procedure section 340, subdivision (3) applied to a section 3344 cause of action. Specifically, Johnson concluded the statute of limitations "for injury to ... one caused by the wrongful act or neglect of another, ..." was applicable to a section 3344 claim. (Former Code Civ. Proc. § 340, subd. (3).) The rationale for this limitations period was that: "It has repeatedly been held that this clause `"was intended to embrace therein all infringements of personal rights as distinguished from property rights.'" [Citations.] One's right to privacy is patently such a personal right." (Cain v. State Farm Mut. Auto. Ins. Co. (1976) 62 Cal.App.3d 310, 313, 132 Cal.Rptr. 860.) The Johnson court clearly understood that "[t]he right of privacy is a purely personal one, fashioned to protect an individual's solitude." (Johnson, supra, 43 Cal.App.3d at p. 883, fn. 1, 118 Cal.Rptr. 370.)
However, section 3344 is now understood as securing a proprietary interest, rather than an invasion of privacy. (KNB Enterprises v. Matthews, supra, 78 Cal. App.4th at p. 366, 92 Cal.Rptr.2d 713 ["The right of publicity has come to be recognized as distinct from the right of privacy"]; McCarthy, The Right of Publicity and Privacy (2d ed.2007) § 10:7, p. 462 ["The courts have uniformly held that the right of publicity is a `property' right"].) It is an economic right. (Winter v. DC Comics (2003) 30 Cal.4th 881, 889, 134 Cal.Rptr.2d 634, 69 P.3d 473.)
Code of Civil Procedure section 339 has been held to apply to torts protecting property rights. (Barton v. New United Motor Manufacturing (1996) 43 Cal. App.4th 1200, 1207, 51 Cal.Rptr.2d 328.) Therefore, the rationale of Johnson made sense at the time it was decided. In keeping with the right of publicity as a protection of a property interest, not a personal interest, Christoff is not seeking damages for injury to his personal dignity but instead for the commercial use of his likeness. We hold the two-year limitations period in Code of Civil Procedure section 339 is applicable.[10]

IV. Section 3344 Requires a Knowing Use of a Plaintiffs Name, Voice, Signature, Photograph, or Likeness Regardless Whether the Plaintiff Is a Celebrity
Nestlé argues that section 3344 is inapplicable to this case because it did not "knowingly use" Christoff's likeness and because Christoff is not a celebrity. For reasons we explain, we reject both arguments.
Section 3344 provides in pertinent part: "Any person who knowingly uses another's name, voice, signature, photograph, or likeness, in any manner, on or in products, *141 merchandise, or goods, or for purposes of advertising or selling, or soliciting purchases of, products, merchandise, goods or services, without such person's prior consent, or, in the case of a minor, the prior consent of his parent or legal guardian, shall be liable for any damages sustained by the person or persons injured as a result thereof." (§ 3344, subd. (a), italics added.) Nestlé incorrectly argues that Christoff cannot recover under this statute because he did not show Nestlé knew it lacked his consent or that he was a celebrity.

A. "Knowing Use"
At common law, a cause of action for appropriation of name or likeness consisted of the following elements: "(1) the defendant's use of the plaintiffs identity; (2) the appropriation of plaintiffs name or likeness to defendant's advantage, commercially or otherwise; (3) lack of consent; and (4) resulting injury." (Eastwood v. Superior Court, supra, 149 Cal.App.3d at p. 417, 198 Cal.Rptr. 342.) The statutory cause of action under section 3344 has the additional elements of (1) knowing use and (2) for purposes of advertising or solicitation of purchases. (Eastwood v. Superior Court, supra, 149 Cal.App.3d at p. 417, 198 Cal.Rptr. 342; see also Downing v. Abercrombie & Fitch, supra, 265 F.3d at p. 1001 [discussing § 3344].) Thus the modification from the common law cause of action was to add the requirement of a "knowing use," not a "knowing use without consent."
Nestlé argues there was no violation because it did not knowingly use Christoff's likeness without his consent. Nestlé's construction is inconsistent with the plain language of section 3344 and would lead to an absurd result. A defendant would always benefit from a failure to investigate, as in this case, where Nestlé's counsel argued to the jury as follows: Steele said "If I could do it again, sure, I would try a little harder. Maybe I would look for a writing. Maybe I would try to call somebody." In this case, Nestlé knowingly used Christoff's image. They chose him because of his "distinguished" look and because he would provide continuity with Taster No. 1. Christoff was not required to also show that Steele (or Nestlé) had actual knowledge he did not consent to the use of his likeness.

B. Celebrity Status
Nestlé's second misconstruction of section 3344 is its claim that the statute limits the remedy of profits to a celebrity plaintiff. Section 3344 applies whenever "any person" knowingly uses "another's" likeness. (§ 3344, subd. (a).) Although the injury to the celebrity and the noncelebrity might differ, section 3344 does not require the plaintiff to be a celebrity in order to recover damages, including actual damages and profits. (KNB Enterprises v. Matthews, supra, 78 Cal.App.4th at p. 367, 92 Cal.Rptr.2d 713.) "[T]he appropriation of the identity of a relatively unknown person may result in economic injury or may itself create economic value in what was previously valueless." (Motschenbacher v. R.J. Reynolds Tobacco Company, supra, 498 F.2d at pp. 824-825, fn. 11.)

V. To Recover Profits Under Section 3344, Christoff Must Show that the Profits Were Attributable to the Use of His Likeness
Nestlé argues that the record lacks substantial evidence to support the over 15 million dollar profits award. Resolving this issue requires a close reading of the language of section 3344. Section 3344 allows the recovery of profits "from the unauthorized use that are attributable to the use and are not taken into account *142 in computing the actual damages." (§ 3344, subd. (a).) Nestlé argues that Christoff failed to provide substantial evidence of profits attributable to him. Christoff responds that the testimony of his expert, Peter Sealy, provides ample evidence to support the verdict. We first summarize Sealy's testimony and then discuss the parties' arguments.,

A. Sealy's Testimony
Peter Sealy, an adjunct professor of marketing at the University of California at Berkeley Haas School of Business and visiting professor at Stanford University, testified to the following. The icon of the "taster" on the Taster's Choice instant coffee label "is a visual cue that becomes a ... link back to the product, a way to further identify the product." The "taster" "is a key visual ... that is a point of continuity for probably multiple variations of Taster's Choice, decaffeinated, different flavors, et cetera." The icon constitutes "a unique visual approximation of the promise of the brand. Great taste." "It's a visualization of a taster making a choice" and a "validation that a taster would choose this particular instant coffee."
The picture of Christoff is a handsome male who "is distinctive." The use of a human face is important based on our history as "hunter-gatherers, when we were looking for food in the plains of Africa. Our eye is attracted most immediately to two thingsthe human face or the shape of an animal."
Sealy attributed 50 percent of the sales of Taster's Choice to the logo "Taster's Choice," and five to 15 percent to the icon. "The remaining [forty] percent is the shape of the jar, the shape of the label, the predominant color red, the smoother taste richer flavor promise, the ... weight of the product, a hundred percent pure coffee."
Sealy's opinion was that "the taster can be attributed to" 10 percent of the sales. That is what he "would value that ... icon, were I the marketing manager for the Taster's Choice unit of Nestlé" "I believe the icon, if you took that off, you would have lost ten percent of the sales of Taster's choice, whatever that might have been."
On cross-examination Sealy acknowledged that he was not testifying "it is Mr. Christoff, the human being, who is responsible for ten percent of any sales" but instead that "it is the image of the taster which has become the icon" that is responsible for the 10 percent of the sales. "[I]f you took that icon off the package during the time he was on the package, I think you would lose ten percent of the sales of Taster's Choice." Sealy further acknowledged the icon was a functional illustration of a person enjoying a cup of coffee.

B. Sufficiency of the Evidence of Profits
Sealy's testimony indicates five to 15 percent of profits were attributable to the icon. This testimony would constitute substantial evidence that the profits were attributable to Christoff, as required by section 3344, only if Christoff "was" the icon as he argues.
Cases distinguishing a violation of the Copyright Act from a section 3344 cause of action show the narrow, but critical, distinction between Christoff the person and the icon that contained Christoff's picture. The Copyright Act protects the photograph and section 3344 protects the identity or persona of an individual. (Downing v. Abercrombie & Fitch, supra, 265 F.3d at p. 1004.) "To argue that the photograph is identical with the person is to confuse illusion and illustration with reality." (Ibid.) The value (for purposes of a section 3344 *143 claim) that Christoff gave is the value of his identity or persona. "The right of publicity protects the intangible proprietary interest in the commercial value in one's identity." (Lugosi supra, 25 Cal.3d at p. 845, 160 Cal.Rptr. 323, 603 P.2d 425 (dis. opn. Bird, C.J.); Guglielmi v. Spelling-Goldberg Productions (1979) 25 Cal.3d 860, 864, 160 Cal.Rptr. 352, 603 P.2d 454 (cone. opn. Bird C.J.);[11] see also McCarthy, The Rights of Publicity and Privacy, supra, § 1:7, pp. 9-10; Rest.3d Unfair Competition, § 46, com. d, p. 531 ["The right of publicity protects the commercial value of a person's identity"].) The subject of a section 3344 claim is the person's likeness, even where such likeness is embodied in a photograph. (KNB Enterprises v. Matthews, supra, 78 Cal.App.4th at p. 374, 92 Cal.Rptr.2d 713.)
It follows that the profits "attributable" to Christoff flow from his ability based on his identity or persona to attract sales. The critical question is Christoff's "ability ... to attract the attention and evoke a desired response in a particular consumer audience. That response is a kind of good will or recognition value generated by that person. [Citations.]" (Lugosi supra, 25 Cal.3d at p. 835, 160 Cal.Rptr. 323, 603 P.2d 425 (dis. opn. of Bird, C.J.); Cf. Eastwood v. Superior Court (1983) 149 Cal. App.3d 409, 422, 198 Cal.Rptr. 342 ["Often considerable money, time and energy are needed to develop the ability in a person's name or likeness to attract attention and evoke a desired response in a particular consumer market"].) In contrast, profits resulting solely from the strategic decision to place an icon of a taster on the Taster's Choice label are not attributable to Christoff. The icon with the image of a handsome man existed before and after Christoff's likeness was used.
This is not to say that Christoff's photograph did not improve Nestlé's profits during his tenure as the taster. Even though images may be fungible, Nestlé may still gain a commercial advantage from the use of Christoff. (Ainsworth v. Century Supply Co. (1998) 295 Ill.App.3d 644, 651, 230 Ill.Dec. 381, 693 N.E.2d 510.) It may be that the "generic" nature of Christoff's image helped Nestlé appeal to the "generic" consumer and entice consumers to purchase Taster's Choice. But, in order to recover profits on this basis, Christoff must present such evidence.
Sealy provided no evidence that Christoff's specific characteristics (even if generic) created a value in the icon of the taster. Sealy's acknowledgement, albeit on cross-examination, that Christoff, the person, was not responsible for 10 percent of the profits shows Sealy was relying on the illustration, not the identity or persona of Christoff. It is the identity or persona that is the crux of an appropriation claim and that is the basis for the disgorgement of profits from the misappropriator.
However, if on retrial, Christoff is able to carry the initial burden of demonstrating that some portion of Nestlé's profits was attributable to the use of his likeness, Nestlé then would bear the burden of "disentangling" the contribution of the various other factors. (Lugosi supra, 25 Cal.3d at pp. 855-856, 160 Cal.Rptr. 323, 603 P.2d 425 (dis. opn. Bird, C.J.).) "[T]he resulting allocation must `favor the plaintiffs in every reasonable chance of error.'" (Ibid.) The profits provision of section 3344 is patterned after statutes governing copyright infringement that require "defendants must be content to accept much of the embarrassment resulting from mingling the plaintiffs' property with their *144 own."[12] (Sheldon v. Metro-Goldwyn Pictures (2nd Cir.1939) 106 F.2d 45, 51; see also Sygma Photo News, Inc. v. High Society Magazine Inc. (2nd Cir.1985) 778 F.2d 89, 95-96.)

VI. The 15 Million Qunatum Meruit Award and the Attorney Fees Must Be Reversed
Nestlé argues that the quantum meruit recovery of $15,635,850 must be limited to the value of the services rendered and not the value of the benefit conferred. Christoff does not dispute that the quantum meruit award must be reduced to $330,000, the amount of actual damages found by the jury.
As the parties agree, the recovery on a quantum meruit claim is based on the value of the services conferred, not the value of the benefit. (Maglica v. Maglica (1998) 66 Cal.App.4th 442, 446, 78 Cal.Rptr.2d 101.) For that reason it cannot include the profits and must be reduced. However, contrary to Christoff's argument, the $330,000 award also must be reversed. The basis of this award, which is part of each cause of action, is the multiple use of Christoff's image over a six-year period, as that was the only evidence Christoff presented. The jury was able to reach this conclusion because the trial court failed to recognize the applicability of the SPR and gave incorrect instructions on the applicability of the discovery rule.
The attorney fees award, based on the entry of a judgment in Christoff's favor on the section 3344 cause of action, must also be reversed. If Christoff prevails on remand, he is entitled to attorney fees under section 3344, subdivision (a).

VII. Conclusion
Once the trial court found that the SPR did not apply, the jury was not properly instructed on several issues it needed to decide. In a retrial, the trier of fact must consider whether a reasonable person in Christoff's position had a meaningful ability to discover the use of his likeness and whether any republications occurred within the two-year limitations period. With respect to each republication prior to two years before the filing of the complaint, the trier of fact must consider whether a reasonable person in Christoff's position had a meaningful ability to discover the use of his likeness on that occasion.
Christoff is not required to show that Nestlé knew it lacked his consent when it used his image or that he was a celebrity. To recover profits under section 3344, Christoff is required to provide some evidence that the profits were attributable to the use of his identity or persona. If he does, the burden then shifts to Nestlé to show that the percentage of its profits that are not attributable to the use of Christoff's persona.

DISPOSITION
The judgment is reversed. The order awarding attorney fees is reversed. The case is remanded to the trial court for retrial. Each party to bear his or its own costs on appeal.
RUBIN, and BOLAND, JJ., concur.
NOTES
[1] Civil Code section 3344 provides in pertinent part: "Any person who knowingly uses another's name, voice, signature, photograph, or likeness, in any manner, on or in products, merchandise, or goods, or for purposes of advertising or selling, or soliciting purchases of, products, merchandise, goods, or services without such person's prior consent ... shall be liable for any damages sustained by the person or persons injured as a result thereof. In addition, in any action brought under this section, the person who violated the section shall be liable to the injured party or parties in an amount equal to the greater of seven hundred fifty dollars ($750) or the actual damages suffered by him or her as a result of the unauthorized use, and any profits from the unauthorized use that are attributable to the use and are not taken into account in computing the actual damages."

Unless otherwise indicated, undesignated statutory citations are to the Civil Code.
[2] Nestle Canada is a corporation affiliated with but separate from respondent and is not a party to this appeal.
[3] Nestlé challenged the date Christoff knew or should have known of the use of his likeness. However, the jury found that he neither knew nor should have discovered it prior to finding the coffee jar in the Rite Aid store.
[4] Hunter further explained his figure as follows: (1) $10,000 for eight different types of coffee over a six-year period totaling $480,000; (2) $240,000 for electronic media; (3) billboards at $7,500 times six years for a total of $45,000; (4) one year of transit ads at $7,500; (5) kiosks at $5,000 for six years totaling $30,000; (6) brochures at $5,000 for six years totaling $30,000; (7) point of purchase advertisements at $5,000 a year for six years totaling $30,000. Hunter assumed each of these uses existed based on information from Christoff's counsel. The remainder is for advertisement in foreign countries which totaled $570,000 and which is also based on a six-year time frame.
[5] The court reserved judgment on the unjust enrichment cause of action and never ruled on it. The court, however, made clear that it intended to dispose of all causes of action when it entered the judgment. In a post-judgment hearing, the court stated that it lacked "jurisdiction to modify" the judgment, indicating the court intended to enter a final judgment and the substance of this appeal is from a final disposition of all issues between the parties. "When `the trial court's failure to dispose of all causes of action results from inadvertence or mistake rather than an intention to retain the remaining causes of action for trial' [citation], the appellate court has discretion to `preserve the appeal by amending the judgment to reflect the manifest intent of the trial court' [citations]." (Sullivan v. Delta Air Lines, Inc. (1997) 15 Cal.4th 288, 308, 63 Cal.Rptr.2d 74, 935 P.2d 781.) Because the judgment must be reversed, we need not order the trial court to amend the judgment.
[6] Dean Prosser, in an influential law review article, explained that the "`law of privacy comprises four distinct kinds of invasion of four different interests of the plaintiff ... as follows: [¶] 1. Intrusion upon the plaintiff's seclusion or solitude or into his private affairs. [¶] 2. Public disclosure of embarrassing private facts about the plaintiff. [¶] 3. Publicity which places the plaintiff in a false light in the public eye. [¶] 4. Appropriation, for the defendant's advantage, of the plaintiff's name or likeness.'" (Lugosi v. Universal Pictures (1979) 25 Cal.3d 813, 819, 160 Cal.Rptr. 323, 603 P.2d 425 (Lugosi), italics omitted, quoting Prosser, Privacy (1960) 48 Cal. L.Rev. 383, 389.)
[7] The California Legislature passed legislation superseding the holding of the majority in Lugosi, supra, 25 Cal.3d 813, 160 Cal.Rptr. 323, 603 P.2d 425 that the right of publicity was not descendible. (§ 3344.1, subds. (a)(1) & (b).)
[8] A similar rule is now recognized in the Restatement of Torts section 577A and was codified in the Uniform Single Publication Act. (14 West's U. Laws Ann. (2005) U. Single Publication Act (1952), pp. 469-475.)
[9] The Copyright Act is inapplicable for purposes of determining the accrual of Christoff's causes of action. Copyright law defines accrual of a cause of action differently from the SPR. Under the Copyright Act, a cause of action for infringement does hot accrue until "the copyright holder `has knowledge of a violation or is chargeable with such knowledge.'" (Polar Bear Productions, Inc. v. Timex Corp. (9th Cir.2004) 384 F.3d 700, 706.) A claim can accrue multiple times because "each infringement is a distinct harm." (Roger Miller Music, Inc. v. Sony/ATV Publishing, LLC (6th Cir.2007) 477 F.3d 383, 390.)

In contrast, the SPR expressly defines accrual "regardless of when the plaintiff secured a copy or became aware of the publication." (Shively, supra, 31 Cal.4th at pp. 1245-1246, 7 Cal.Rptr.3d 576, 80 P.3d 676.) The SPR further was designed to avoid a continuing violation regardless of the number of copies of the publication distributed. (Shively, supra, 31 Cal.4th at pp. 1245-1246, 7 Cal. Rptr.3d 576, 80 P.3d 676.) Whereas copyright infringement exists for each continuing violation, by definition the application of the SPR limits the wrong to a single publication. In contrast to the Copyright Act, the SPR prioritizes the importance of a single lawsuit and "[i]nquiry into whether delay in discovering the publication was reasonable has not been permitted for publications governed by the single-publication rule." (Shively, supra, 31 Cal.4th at p. 1251, 7 Cal.Rptr.3d 576, 80 P.3d 676.) The difference in the balance of protection to potential plaintiffs between the Copyright Act and the SPR for purposes of determining the accrual of a cause of action convinces us the copyright rule has no application here.
[10] Nestlé argues that "[i]n Johnson, the court held that section 3344 is a codification of a tort claim for `invasion of privacy,' and that '[t]he applicable statute of limitations for tortious invasion of privacy is found in Code of Civil Procedure section 340, subdivision [c], which sets forth a one year period during which the action may be filed.'" (Quoting Johnson, supra, 43 Cal.App.3d at pp. 894-896, 118 Cal.Rptr. 370.) By placing the brackets, Nestlé incorrectly substitutes the [c] for the prior version of the statute as it existed in 1974 when Johnson was decided. What Nestlé ignores is that former Code of Civil Procedure section 340, subdivision (3) was amended in 2002 when the Legislature enacted Code of Civil Procedure section 335.1, and the statute of limitations is now two years.
[11] Justice Newman concurred in Chief Justice Bird's discussion of the right of publicity but agreed with the majority that the right was not descendible. Justices Tobriner and Manuel also concurred in Justice Bird's opinion, giving that concurring opinion four votes.
[12] Title 17 United States Code section 504(b), provides as follows: "The copyright owner is entitled to recover the actual damages suffered by him or her as a result of the infringement, and any profits of the infringer that are attributable to the infringement and are not taken into account in computing the actual damage. In establishing the infringer's profits, the copyright owner is required to present proof only of the infringer's gross revenue, and the infringer is required to prove his or her deductible expenses and the elements of profit attributable to factors other than the copyrighted work."