[Civ. No. 14679. Second Dist., Div. Three. Apr. 30, 1945.]

CAROLINE CONGER, Respondent, v. HARRY WHITE et al., Defendants; JAMES M. GORDON, Appellant.

Maurice Gordon for Appellant.

William B. Etheridge for Respondent.

SHINN, J.—Plaintiff won a verdict for $17,003.92 (including $5,000 as exemplary damages) against Harry White and appellant, James M. Gordon, as damages sustained in three purchases of real property in Tulare County, which purchases were found to have been induced by fraudulent representations of the defendants. Defendant Gordon appeals.

The first purchase was on December 6, 1940, of 40 acres for a price of $5,400 in cash and the transfer by plaintiff of 16 acres in the same vicinity; the second on January 3, 1941, of 20 acres for $2,700, and the last one on February 11, 1941, for a price of $3,000. In the second transaction plaintiff repurchased 15 of the 16 acres she had parted with in the first transaction, although she alleged she did not know this at the time. As the several sales were agreed upon with plaintiff, the land would be purchased from the owner and subdivider, one Murray Blank, in the name of an employee of White, who would convey to plaintiff. The purchases from Blank were at $35 per acre. Plaintiff is a widow eighty-one years of age. White had made heavy purchases of grazing land from Blank ($175,000 over a three-year period), reselling it to the public as oil land. Plaintiff had purchased her 16 acres from Gordon in 1939 at a price of $150 per acre. In White's first conversation with plaintiff he represented that he was the agent of the Northwest United Oil Company and was acting for the company in acquiring land to sell to a major oil company, that the transaction had been arranged, the oil company had placed its money in escrow, that the sale would be completed in about two months, or as soon as the

desired land could be secured, and that plaintiff would at least double her money when the deal was closed. He also represented that the land was assessed at $300 per acre as grazing land. In her first purchase plaintiff gave her check for $5,400 and a deed to her 16 acres and received a deed of 40 acres from White's employee. On the following Christmas she received a box of candy from Northwest company, with a card from White, and a box of crystallized fruit from Gordon. The representations were repeated by White in the second sale and it was urged upon plaintiff that the more land she had to turn over to the major oil company the more money she would make. In the last sale of 20 acres White represented also that the oil company would not take a tract of less than 80 acres and that plaintiff would have to buy an additional 20 acres so that her land could be included. He also represented that plaintiff would then own 80 acres in one piece. The facts were that the Northwest company was a fictitious name under which White transacted business, the land was assessed at only $6.00 per acre, there was no deal in prospect with any oil company, and the three parcels were not contiguous, one of them being six miles distant from the other two.

■ Appellant does not suggest that there was a semblance of honesty in the transactions but he earnestly asserts that there was insufficient evidence to connect him with them, especially with the second and third. The salient features of the evidence as to appellant's participation in the fraud are the following: White, who was a stranger to plaintiff, called upon her at the apartment house where she lived in Pasadena, representing himself as desirous of purchasing her 16 acres for the Northwest company. Plaintiff told him she had promised appellant not to dispose of the land without first consulting him. White finally proposed to sell plaintiff 40 acres. He had not intended to buy her land but offered to take it in as a part of the deal. Appellant put in an appearance at this time, which White testified was in accordance with an arrangement which they had. Plaintiff introduced the two and neither acknowledged any previous acquaintance, although they had known each other for several years. The three went to plaintiff's apartment, where White, in the presence of appellant, repeated his representations and his proposal to sell plaintiff 40 acres. Plaintiff declined to purchase more land and the defendants left without transacting

any business with her. Shortly thereafter White called upon plaintiff again with the same proposition. He testified that he had originally intended to sell plaintiff land in Fresno or Kings County but that appellant advised him to sell her land in Tulare County, where she already had land, stating that plaintiff would offer little resistance to a sale of Tulare County land; that he, White, offered to give appellant 50 per cent of the profits on the deal; that between his first and second visits he frequently talked with appellant and it was arranged that when White called upon plaintiff again he would let appellant know so that the latter could be in his office to receive a telephone call; that appellant agreed and stated that he would expect half of the profits. Upon White's second visit plaintiff was still unwilling to buy land but at White's suggestion, she called appellant, who promptly arrived on the scene. White thereupon repeated his statements concerning the land in the presence of appellant but was unable to persuade plaintiff to buy the 40 acres. He finally left the room for 15 or 20 minutes, at appellant's request, in order that appellant might discuss the matter privately with plaintiff. During his absence appellant said to plaintiff, according to her testimony: "It is a good investment; it is good land; White is a good man; he understands the oil business and his proposition is fair all right; there is a good chance in this investment, and I would advise you to go into it. In fact, I believe if I had the funds, I would go in it myself." Plaintiff was convinced and, at appellant's request, called in White, and appellant told him that plaintiff had decided to make the investment. Plaintiff then wrote a check for $5,400 and delivered it to White in the presence of appellant. She testified that she believed and was convinced by appellant's statements that it was a safe investment and that she could rely upon what White told her. White testified that he cashed plaintiff's check, paid for the land, and gave appellant half of the profits in cash. He did not deny having represented that the land would be turned over to an oil company at a large profit but testified that he was only repeating what appellant had told him. White also testified that he talked with appellant after the first sale, that appellant told him he thought plaintiff would repurchase the 16 acres, and that after she had done so he gave appellant $1,250 as his share of the profits; that thereafter appellant told him that plaintiff would probably purchase another 20 acres and

that after she had done so he paid appellant half of the profits of the sale. He further testified that he and appellant negotiated with Blank for the purchase of the several parcels and that appellant had paid him, White, 5 per cent of $4,400, which appellant had received in the transactions, under an agreement that White was not to report payment of any sums to appellant as income, and that the 5 per cent should be used in paying the increased income tax which White would have to pay.

Appellant had become acquainted with plaintiff in 1935. He traded her a small piece of property for two bonds that were in default. Later he acquired two deeds of trust from plaintiff in exchange for real property. He testified that he "advised" plaintiff to make the exchange of her trust deed; that in 1939 he "recommended" to her that she exchange the property he had first traded to her for 16 acres in Tulare County, which she did. None of the properties were shown to plaintiff. While appellant apparently considered himself to be in a position to advise and recommend investments for plaintiff, it did not appear that his advice had been sought by plaintiff or that he had given her advice upon other occasions prior to the purchase of the 40 acres. Appellant's testimony consisted of denials of any and all participation in the three transactions with plaintiff. He testified that he was present when White was discussing plaintiff's 16 acres and that the only advice he gave plaintiff was that she close any sale she might make through a bank escrow; that he left plaintiff's apartment before White did and did not learn for some time thereafter that plaintiff had purchased any land. He testified that he had known White for several years but had never had any dealings with him. He denied in toto plaintiff's testimony as to his statements concerning White and the merits of his offer and he denied having received any money from White at any time. Appellant did not see plaintiff or talk with her again until after she had made her third purchase.

Murray Blank testified that some two weeks prior to the first sale to plaintiff, appellant came to his office seeking to buy land, told him that he had a partner in the deal, negotiated for land at $35 per acre, came back later with White, and then said that he and White would sell pretty nearly all of Blank's land; that appellant and White came to his office

together when the 40 acres were purchased. The witness also testified that he had been selling prospective oil lands to White and appellant for several years; that for about two weeks prior to the purchase of the 40 acres the two were in his office together frequently and that appellant then told him that he and White were going to work together on the property; that he had seen money pass between White and appellant in his office, mostly from White to appellant; that during the month or five weeks in that interval they had been in his office together twenty or twenty-five times. He also testified that in the early part of January, 1942, he had talked with appellant regarding the transactions with plaintiff. Plaintiff's attorney had interviewed him and told him that he was opposing White's release from prison on parole; that he, Blank, sent for appellant, told him of his talk with plaintiff's attorney and also that Mrs. White had telephoned about White's efforts to obtain parole and he urged that a settlement be made with plaintiff. He testified that appellant said: "Well, I don't like White; he betrayed me and I would rather see him suffer; he stole $8,000 out of that money that he received from that lady for which he didn't account to me," and said further, "I will speak to my brother, who is my lawyer, and see what he says about it." He also testified, "Gordon got fifty percent of $8,000; that is what he said to me." The witness confessed to a strong dislike for appellant and was outspoken in his criticism of the transactions with plaintiff. George Manns, who was White's attorney, testified to a conversation with appellant in February, 1942, in which he told appellant that he had heard from White (who was then in State's Prison), that White was not going to report as income the "moneys" he had paid appellant in 1941, and that appellant had replied that White had agreed to report "those moneys" and that as far as he was concerned that was the end of it.

For reasons which will be stated, it is necessary to consider not only the legal sufficiency of the evidence but also the weight of the evidence which was relied upon to connect appellant with the several sales. There were some contradictions in the testimony of plaintiff and also in that of White and some contradictions between the testimony of the one and that of the other, but they related to immaterial matters. Those found in plaintiff's testimony were only such as might have been expected, considering her age and the lapse of

time since the events she was describing. Plaintiff gave a clear account of the representations of the defendants and her testimony was strongly corroborated by the circumstances under which she parted with her money. That the testimony of White should have been looked upon with suspicion cannot be gainsaid. It is open to doubt whether, standing alone, it would have carried sufficient weight to convict appellant of fraud. The witness Blank had a poor opinion of appellant and was unfriendly toward him, which was to be considered in weighing his testimony as to appellant's alleged admissions. Appellant's explanations were not too plausible. He insisted that he actually believed White was not intending to sell plaintiff any property but only to buy what she then owned, at a price that would give her what it had cost her. He testified that he left White in the company of plaintiff without any thought that White would try to sell her any land. But in this connection it is noteworthy that he also testified that he had had a previous experience with White, when the latter had made trouble for him with one of his clients, to whom White had made sales amounting to $18,000 or $20,000 and which, he testified, he naturally resented. It is not surprising that the jury rejected this confession of naïveté upon the part of an experienced dealer in oil expectancies and believed plaintiff's testimony that it was appellant's assurances that caused her to make the second and third purchases as well as the first. If appellant had not been interested in the result, he undoubtedly would have looked upon White as a trespasser. Appellant did not claim that he had warned plaintiff not to purchase land from White or that he had communicated with her to find out whether she had done so or whether she had sold her land to White. This was not the conduct of a man who was interested in seeing that plaintiff did well with the land which he had sold her, and yet that is the attitude which he professed to hold. It is true there was no direct corroboration of White's testimony that he had divided the profits with appellant. It is, however, scarcely conceivable, assuming the truth of plaintiff's testimony, that he did not receive any of the profits from the first sale. And if he did and his share was paid in cash, he probably would have received his share of the other profits in the same way. And if he recommended White as an honest and reliable man and his proposal as a good one, he should have expected White

to take advantage of the recommendation for the purpose of making other sales. There is little doubt in our minds that appellant knew what was likely to happen to plaintiff if she was not warned against White, and it appears probable that with slight encouragement from appellant she would have refused to purchase any land. If the jury believed that he conspired with White to sell land to plaintiff at $135 per acre ($195 per acre on the first sale if the cost to plaintiff of the 16 acres is included), they would have been legally justified in accepting the circumstantial evidence, with the testimony of White, Blank and Manns, as sufficient to connect him with the other sales. There was not such an entire absence of evidence, direct and circumstantial, to connect appellant with the three transactions, as to require a reversal or modification of the judgment upon that ground alone.

Appellant's second contention is that there was insufficient evidence to establish the value of the land which plaintiff acquired, and which was necessary in order to fix the damages. One expert witness, Elmer F. Karpa, testified for plaintiff. He conducts a real estate brokerage and appraisal business and a loan business at Bakersfield. He had been buying and selling land in the San Joaquin Valley since 1920, and had been acting as a broker since 1926. He had taken a university extension course in appraising and had a wide and varied experience as an appraiser and upon *voir dire* examination testified to having taken the usual means of investigation and examination to familiarize himself with values. There was nothing unsound in the basis of his opinions and his conclusions appeared to have been the result of careful study. His testimony was not without probative value and the jury were warranted in accepting his appraisal of $17.50 per acre as the market value of the land, in preference to the valuation of $50 per acre given by defendant's expert, who based his opinion upon the hypothetical existence of active drilling in the vicinity, although no well was being drilled.

Appellant requested separate instructions to the effect that the testimony of an accomplice should be viewed with distrust and the testimony of oral admissions of a party with caution. White had admitted upon cross-examination that he had just served a term of imprisonment upon conviction of a felony, and appellant requested an instruction

to the effect that the jury might consider that fact in judging of his credibility and the weight to be given to his testimony. The instructions were refused and no instruction was given which purported to cover the same rules of evidence. Section 2061, subdivision 4, of the Code of Civil Procedure provides that cautionary instructions such as those requested be given in proper cases respecting the testimony of accomplices and testimony of oral admissions of a party. In *People* v. *Dail* (1943), 22 Cal.2d 642 [140 P.2d 828], it was held that such instructions should be given in proper cases and that the failure to give them might constitute reversible error. The court disapproved of earlier cases which had held subdivisions 3 and 4 of the section to be unconstitutional and other cases in which such instructions had been said to state mere commonplaces with which all jurors were familiar, and which had held the failure to give them to be harmless error, if error at all. The evidence, as related to the second and third transactions especially, called for proper instructions as to the rules by which the testimony of White should be weighed. His testimony was not only that of an accomplice but of one who had been convicted of a felony as well. The jury should have been instructed in accordance with the provisions of section 2051 of the Code of Civil Procedure, that the fact of his conviction should be taken into consideration in judging of his credibility. There is no rule of human experience which furnishes a pattern for the appraisal of the veracity of every man who has been convicted of a felony and the law does not provide one. Neither does it allow the fact to be ignored, for it declares that it is one to be considered. We would not undertake to say how a jury would go about it to reach a conclusion as to the degree of credibility which a witness loses through proof of his conviction of a felony, but the law declares, in effect, that it has some weight and leaves it to the jury to determine the effect of it. That perhaps would not be more difficult for a jury to do than it would be to determine the weight of a disputable presumption as opposed to the reasonable and logical testimony of witnesses, and this is held to require no psychic powers. In all events, the code specifies how a witness may be impeached and it is not for the court to say that this law is meaningless.

 The instruction as to oral admissions would have

been pertinent in weighing the testimony of the witnesses Blank and Manns. The first of these testified to appellant's statement that White had made away with $8,000 of plaintiff's money without accounting to him for it and that appellant expected half of the profits. That statement might or might not have been considered as relating to a preexisting agreement as to the second and third sales; $8,000 would be the approximate sum which White would have retained for himself as profits in the latter sales after he had divided with appellant the profits from the first one. And Blank, it will be remembered, was not a friendly witness. The statement of appellant, testified to by the witness Manns as having been made in connection with White's income tax return, is given reference to the later transactions only because the witness used the word "moneys" in his own statement and in that of appellant. It is clear from a reading of his testimony that his account was no more than a report of the conversation in his own language. He was not asked to give his exact words or those of appellant. The word "moneys" was expressed by way of narration and not quotation, and an entirely different interpretation could have been placed upon it if the witness had happened to use the word in the singular. It could then have been understood to refer only to the first transaction. The testimony of both witnesses illustrates the necessity for caution in the consideration of testimony of oral admissions. Each of the requested instructions was of vital importance to appellant and the failure to give them was prejudicial error. Nevertheless, due to the particular circumstances of the case, in which each of the three transactions was severable from the others, and to the evidence which clearly distinguished the first transaction from the other two, we do not regard the failure to give the instructions as a ground for an unconditional reversal of the judgment. It is true that the credibility of defendant White was involved in the whole case. His testimony implicated appellant in all of the transactions. It was strongly corroborated as to the first transaction but scarcely corroborated at all as to the others. The evidence, other than that furnished by his testimony, was convincing as to appellant's guilty participation in the sale of the 40 acres, but there was no evidence at all of his connection with the second and third sales except the testimony of White and certain equivocal oral admissions by appellant

which might or might not have been considered as relating to the later cases. We consider it entirely improbable that the verdict as to the first transaction would have been different if the three instructions had been given. There is, in our opinion, a strong probability that plaintiff would succeed in establishing appellant's responsibility in the first transaction, however often the issue might be tried, even though no weight whatever were given to the testimony of White. Plaintiff's testimony, however, did not connect appellant with the second and third sales; he did not negotiate with Blank for the purchase of those parcels and it did not appear that he retained an interest in the 16 acres in the settlement with White after the first sale. Mrs. Conger did not consult appellant with reference to the later purchases. It may be conceded that it would have been unreasonable to suppose that appellant would knowingly have allowed White to keep all of the profits in the later transactions if he had known of them at the time, but it is quite reasonable to suppose that White would have concealed those transactions from appellant and kept all the profits for himself if he had been able to do so. We conclude it to be not improbable that if the instructions had been given, the jury would have decided that the evidence was not sufficient to establish appellant's connection with the second and third sales. Our view as to a proper disposition of the appeal under the circumstances will be expressed later.

Appellant complains of the modification of another instruction which he requested. It stated some of the features of the law with respect to the qualification of real estate subdivisions for public sale and to the duties of the commissioner with respect to examination and report upon such subdivisions. The purpose sought to be accomplished by the offered instruction is obscure. Portions of the instruction were stricken out and others added, including a statement from the report that a copy of it must be delivered to each prospective purchaser and attached to the deposit receipt or printed thereon, and the court also added: "You will further remember in considering this matter, that there is no testimony that a copy of this report was ever furnished Mrs. Conger or that she had any knowledge of its existence." The matters to which this instruction related were quite foreign to any issue in the case. It was wholly irrelevant whether the

Real Estate Commissioner had put out a report on the subdivision. Defendants were not the subdividers nor owners of the subdivision. There was an implication in the matter added by the court that a copy of the report should have been given to Mrs. Conger and it was stated that this had not been done. Appellant justly complains that these statements were improper, but while we agree that they should not have been made, we think no harm could have resulted from them. The issues in the case were clearly defined. The representations upon which plaintiff relied were specifically pleaded and they were stated with great particularity in the instructions. The jury were told that unless plaintiff proved by a preponderance of evidence that one or more of such specific representations had been made and that it was a material representation, the verdict must be for the defendants. Appellant cannot complain that the entire subject matter of the instruction was foreign to the issues, for he requested the instruction. The instructions were carefully drawn as a whole and the issues were stated so thoroughly that we think the jury would not have been misled by the mere suggestion of a false issue. In view of the disposition to be made of the appeal it is unnecessary to discuss other instructions criticized by appellant.

The jury included in its verdict interest at 7 per cent upon each of the sums paid by plaintiff from the date of payment to the time of trial. Appellant contends that this was improper because there had been no rescission of the purchases and he relies upon the rules which govern in rescission cases. These, however, are not in point. The award of interest was proper under section 3288 of the Civil Code, which reads as follows: "In an action for the breach of an obligation not arising from contract, and in every case of oppression, fraud, or malice, interest may be given, in the discretion of the jury." The allowance of interest in fraud cases was approved in *Desmond* v. *Standard Bond & Mtg. Co.* (1928), 91 Cal.App. 201 [266 P. 105]; *Isaacs* v. *Frank Meline Co.* (1934), 2 Cal.App.2d 341 [37 P.2d 1045]. We are aware of no case in which it has been held improper to allow interest, where the recovery was for fraud, since the adoption of the original code section. It should run from the date when the money was paid or the property lost, because the duty to compensate plaintiff for her losses arose then, and no demand was necessary.

██ Appellant makes the additional point that his demurrer should have been sustained on the theory that three causes of action were stated as a single cause of action. We do not construe the complaint as stating more than one cause of action. A conspiracy was alleged between White and appellant to defraud plaintiff by selling her speculative oil properties. All of the acts of defendants were alleged to have been done in pursuance of this common purpose and design. The same representations were relied upon as a basis of the charges of fraud in each sale. The transactions were interwoven so that it would have been impossible for plaintiff to prove fraud in the second or third purchases without first proving fraud in the first one. The three transactions were so closely related as to time and as to the manner of their accomplishment as to indicate that each activity was a part of the original plan and not a new one. That, at least, was the theory of the complaint, which alleged the development of the scheme step by step, and the proof followed the same pattern. The complaint stated but a single cause of action for fraud. In an action for damages for fraud, a complaint which alleges a series of fraudulent acts committed in the execution of an entire scheme to divest plaintiff of his property states a single cause of action. (*Raynor* v. *Mintzer* (1885), 67 Cal. 159 [7 P. 431]; *Divani* v. *Donovan* (1931), 214 Cal. 447 [6 P.2d 247].)

██ The final point for consideration is a charge of misconduct of the jury. One of the jurors took from a blackboard into the jury room a large sheet of paper upon which plaintiff's attorney had entered his computation of damages, consisting of the sums paid by plaintiff in moneys and property, the value of the property she received, computations of interest, and the figure of $5,000 claimed as exemplary damages. Computations of interest and other such matters which summarize the testimony given by witnesses may be placed in evidence as exhibits and the jury may be allowed to take them into the jury room. Computations made by counsel and used in argument are not evidence and if reduced to writing, except by jurors, their use in the jury room is unauthorized. (Code Civ. Proc., § 612.) The action of the juror was improper but the use of the figures by the jury would not necessarily have been prejudicial to appellant. The three transactions were stated separately, which was one of the things

appellant was insisting upon. However, the verdict was in the exact amount of the total of the computations, and the memorandum no doubt was used in arriving at that amount. If objection had been made to the action of the juror, the court should have refused to allow the paper to be taken to the jury room, but it appears that no objection was made until after the verdict had been returned. The point was urged on motion for new trial and appellant's attorney stated by affidavit, "That upon the jury retiring to deliberate, a member of said jury detached the said sheet of paper from the blackboard and took the same into the jury room and said sheet of paper was used by said jury in their deliberations." In an answering affidavit plaintiff's counsel stated that as the jury retired one of the jurors took the paper "in full view of the court, the defendant Harry White and counsel for the defendant James M. Gordon and counsel for the plaintiff" and that no objection was made by counsel for appellant until after the verdict had been returned. The settled statement on appeal states the facts with reference to the incident as they were stated in the affidavit of plaintiff's attorney. It is to be presumed that the trial court on motion for new trial was of the opinion that the incident was observed by appellant's counsel and that he had an opportunity to make a timely objection. If one had been made, the irregularity could have been averted and we think the objection came too late.

It is our opinion that plaintiff should not be deprived of the benefit of the judgment insofar as it relates to the first transaction by reason of the failure to give the requested instructions. Appellant has shown no prejudicial error or no just reason for complaint on account of the relief awarded plaintiff in that transaction. At the same time, the judgment should not be allowed to stand insofar as it imposes liability upon appellant in connection with the other transactions, for as to those, we regard the failure to give the instructions as prejudicial. For these reasons, and because it appears problematical whether plaintiff would prevail upon a retrial as to the second and third transactions, if the jury were instructed as appellant requested, we believe that plaintiff should be allowed to elect whether she will accept the judgment insofar as it awards her damages on account of her purchase of the 40 acres, or retry the action as to all of the transactions. There is no uncertainty as to the amount which was awarded to her

as damage suffered in the first transaction. She paid $5,400 in cash, plus the 16 acres which she conveyed, and which were valued at $400 in arriving at the verdict, a total of $5,800; the land which she received was valued at $17.50 per acre, or a total of $700, and interest was computed on the difference, $5,100, from the date of the transaction to the date of trial. The total amounted to $6,152.99. The same result is reached by taking from the total amount of the judgment $5,000 as exemplary damages and the principal payments, with interest thereon, in the second and third purchases. Upon this same theory and for obvious reasons, if plaintiff should elect not to retry the case, the exemplary damages should be reduced from $5,000 to $2,500, since the recovery will relate to only one transaction instead of three, although it will still represent substantially one-half of plaintiff's total losses.

The judgment is reversed and the action is remanded for a new trial, but upon the condition that if plaintiff shall, within thirty days after the filing of this decision, file with the clerk of this court two copies of a written consent to a remission of the excess of the judgment above the sum of $8,652.99, the judgment shall stand as affirmed in that amount; appellant to recover costs. (Rules on Appeal, rule 24b.)

Desmond, P. J., and Wood (Parker), J., concurred.

On May 21, 1945, the following opinion was rendered:

THE COURT.—A consent to remission of the excess of the judgment above the sum of $8,652.99 having been filed herein, pursuant to the terms of the opinion filed in the above entitled cause on April 30, 1945 (*ante,* p. 28), it is hereby ordered that the judgment be reduced to the sum of $8,652.99, and as so modified the judgment is affirmed. Appellant to recover costs.

Desmond, P. J., Shinn, J., and Wood (Parker), J.