65 Cal.Rptr.3d 351 (2007)
154 Cal.App.4th 1047
William W. MILLER, Plaintiff, Cross-defendant and Appellant,
v.
COLLECTORS UNIVERSE, INC., Defendant, Cross-complainant and Appellant.
No. G036432.
Court of Appeal of California, Fourth District, Division Three.
August 30, 2007.
*352 Boudreau, Albert & Wohlfeil, LLP, Joel R. Wohlfeil, Andrew S. Albert, San Diego; Ross, Dixon & Bell, LLP, and Jon R. Williams for Plaintiff, Cross-defendant and Appellant.
Attlesey & Thomlinson, LLP, Keith A. Attlesey, Laguna Beach, Suzanne M. Shaw; and Armen R. Vartian for Defendant, Cross-complainant and Appellant.

OPINION
IKOLA, J.
Under Civil Code section 3344, subdivision (a) (section 3344(a)), a person who knowingly and' without authorization uses another's name on goods, or to advertise, sell, or solicit purchases of goods or services, is liable to the injured party for statutory damages of $750 or actual damages suffered "as a result of the unauthorized use," whichever is greater, as well as profits from the unauthorized use, discretionary punitive damages, and attorney fees and costs. In this case, a jury found by special verdict that Collectors Universe, Inc. (Collectors), used the name of William W. Miller without his consent on 14,060 certificates opining to the authenticity of various collectible autographs and memorabilia. Each certificate corresponded to a separate and different collectible item. The parties disagreestarklyon the consequence of the jury's finding. In Miller's view, the jury's special verdict entitles him to $10,545,000 in statutory damages, calculated by multiplying 14,060 by $750. Collectors, in contrast, insists Miller's statutory *353 damages are limited to $750 for the single use of his name on all the certificates. The correct assessment of statutory damages turns on the interpretation of section 3344(a) and the application of that statute to the facts in this case.
We hold that under the facts shown by the evidence in this case, Miller had but a single cause of action for wrongful appropriation of his name, thereby limiting his statutory damages to $750. Because the entire trial was premised upon a ruling in limine erroneously interpreting and applying section 3344(a), we reverse for a new trial.

FACTS
Prior to July 2000, Miller and his brother-in-law, Darrell Talbert, cofounded and co-owned Odyssey Group and Odyssey Publications (collectively "Odyssey"). Odyssey Publications published the Autograph Collector Magazine and other publications. Odyssey Group sold and auctioned celebrity autographs and memorabilia, specializing in entertainment and historical categories.
In July 2000, Collectors purchased Odyssey from Miller and Talbert for a purchase price of $810,000[1] and employed both men as officers of the newly created Odyssey division of Collectors. . Collectors engaged in auctioning and selling collectibles. In addition, various divisions of Collectors offered services grading and authenticating stamps, sports cards, coins, and autographs. The division of Collectors that authenticated autographs and autograph memorabilia was PSA/DNA Authentication Services (PSA/DNA). In 2003, PSA/DNA primarily authenticated sports autographs, but sought to expand into historical, political, and entertainment categories, and discussed these plans with Miller. The type of authentication services offered by PSA/DNA involved third party authentication, "where a customer submits an autograph to [be authenticated] for a fee." Miller, in contrast, throughout his collectibles career had performed first party authentication for Odyssey, i.e., authenticating items he personally acquired for Odyssey for resale.
PSA/DNA charged each third party customer a minimum authentication fee of $50; the fee varied depending on whether the customer requested a certificate of authenticity or a letter of authenticity. Each letter of authenticity cost more than $50 and consisted of a letter size sheet of paper bearing a detailed description of the authenticated item and a corresponding serial number. A certificate of authenticity, in contrast, cost $50 and was a 3-by 5inch index card stating, "This item has been examined by PSA/DNA and it is our unwavering opinion that the item is genuine."[2] Thus, a certificate did not identify or describe in writing the authenticated item. The index card certificates were distinguishable from one another only by an individualized serial number. Regardless of whether a certificate or letter documented an authentication, the authenticated item was marked with DNA ink visible only under a laser lamp. In their appellate briefs, both Miller and Collectors refer to certificates of authenticity and letters of authenticity collectively as "COA's." We adopt that terminology for collective reference to those documents.
*354 Between December 2003 and August 2004, Collectors printed approximately 50,000 certificates of authenticity, each bearing Miller's typed name (not his signature) with the typed names of five other individuals under the heading "Expert Committee." Upon a customer's request for a letter of authenticity in lieu of a certificate, PSA/DNA affixed a serial number to the letter and discarded the unused certificate of authenticity linked to that serial number, so that the total number of COA's sold during this period never exceeded 50,000. Each letter of authenticity was signed "[o]n behalf of the PSA/DNA Authentication Team" by one of the five experts other than Miller, and beneath this handwritten signature were imprinted the names and signatures of all six team members, including Miller.
Collectors terminated Miller's employment in May 2004.[3] In a May 23, 2004 email message, Miller angrily informed Collectors' chief executive officer, Michael Haynes, that he (Miller) had never been a PSA/DNA authenticator.[4] Haynes emailed back that he would "immediately make sure [Miller's] name [was] not associated with [PSA/DNA]." Thereafter, Collectors sold no authentications represented by letters of authenticity bearing Miller's name. Collectors did, however, sell some authentications backed by certificates of authenticity bearing his name. The reason for Collectors' continued use of Miller's name on certificates of authenticity after his termination, according to PSA/DNA's president, was that PSA/DNA needed "a couple of weeks to round up some of the authenticators who had been traveling at the time, and to also wait for some of the new preprinted certificates that did not have [Miller's] name on [them]."[5] Ultimately, PSA/DNA issued between "a few thousand" and 14,000 COA's after Miller's termination and possibly even after June 30, 2004, the date Miller's attorney demanded that PSA/DNA cease using Miller's name on COA's.
In August 2004, Miller sued Collectors for common law invasion of privacy and for violating section 3344(a). Collectors cross-complained for misappropriation of trade secrets, breach of contract, and conversion. In phase one of a bifurcated trial (prior to jury selection), Judge Sheila Fell heard argument on whether Miller was entitled under section 3344(a) to recover $750 in statutory damages per COA issued by Collectors without his consent. Judge Fell agreed with Miller's position that "750 can be applied for each violation," and clarified that her ruling was based "mostly" on "the legislative intent." The corresponding minute order reports the court ruled: "For each prohibited authentication, plaintiff is permitted to recover the statutory amount of: 1. Actual damages or $750.00 (whichever is greater); 2. Profits realized by defendant's unauthorized use; 3. Punitive damages; and, 4. Attorneys fees and costs." (Italics added.)
Phase two of the bifurcated trial was held before Judge Robert Monarch, apparently due to "conflicts in Judge Fell's calendar." Before commencing his case-in-chief, Miller dismissed with prejudice his claims for common law invasion of privacy and punitive damages.
*355 Judge Monarch instructed the jury with CACI No. 1804 defining the elements of a section 3344 claim as follows: "Plaintiff claims that defendant violated his right to privacy. To establish this claim, plaintiff must prove all of the following: [¶] 1. Defendant knowingly used plaintiffs name on merchandise or to sell products or services; [¶] 2. Defendant did not have plaintiffs consent; [¶] 3. Defendant's use of plaintiffs name was directly connected to defendant's commercial purpose; [¶] 4. That plaintiff was harmed; and, [¶ ] 5. That defendant's conduct was a substantial factor in causing plaintiffs harm."
As to the potential damages under section 3344(a), the jury was instructed with a modified version of CACI No. 1821 (proposed by Miller) that, unlike the standard instruction, removed the assessment of damages other than profits from the jury's purview. The modified version given to the jury provided: "If you decide that plaintiff has proved his claim against defendant, the court will calculate and award damages, if any, for the certificates of authenticity defendant issued without plaintiffs consent. [¶] In addition, plaintiff may recover any profits that defendant received from the use of plaintiffs name. To establish the amount of such profits, you must: [deduct defendant's expenses from the gross revenue from such use.]" Under the standard CACI No. 1821 not given here, entitled "Damages Under Civil Code Section 3344," the jury "must decide how much money will reasonably compensate [name of plaintiff] for the harm" and award him or her $750 if the plaintiff fails to prove damages such as humiliation, embarrassment, mental distress, and harm to reputation, or proves "an amount of damages less than $750."
The jury was given a modified special verdict form modeled on CACI Verdict Form No. VF-1804. Whereas the standard form asks the jury to compute the plaintiffs damages itemized as past economic loss, future economic loss, past noneconomic loss, and future noneconomic loss, the modified form omitted the question, but did ask the jury to determine "the amount of defendant's profits attributable to defendant's use of plaintiffs name." The modified form also included questions not contained in the standard form, asking "[o]n how many PSA/DNA COA's did defendant use plaintiffs name without consent," "[o]n how many occasions was plaintiff harmed by defendant's use of his name," and "[o]n how many occasions was the use of plaintiffs name by defendant a substantial factor in causing harm to plaintiff." The jury found that Collectors harmed Miller by knowingly using his name on 14,060 COA's without his consent and profited from such use in the amount of $14,060.[6] Unknown to the jury, the consequence of its finding 14,060 unauthorized COA's was that, pursuant to Judge Fell's phase one ruling that Miller could recover $750 in statutory damages for each prohibited authentication, Miller's statutory damages exceeded $10,000,000.
Before rendering judgment, Judge Monarch tentatively decided to declare "a mistrial only with respect to the determination of statutory damages under section 3344(a). Judge Monarch found "the damages that would result from complying with [Miller's] request ... are excessive and violate defendant's due process rights." He "suggested that in the event of a retrial, ... the jury be allowed to quantify the damages and be given further guidance in connection to the statutory reference to `unauthorized acts' and `harm' *356 as well as the several other factors that should be considered to aid it in arriving at a fair amount of damages with respect to the circumstances of this case." Rather than accepting Judge Monarch's suggestion of a mistrial, Miller and Collectors asked him to issue an order that could be immediately appealed. Citing Norgart v. Upjohn Co. (1999) 21 Cal.4th 383, 399-403, 87 Cal.Rptr.2d 453, 981 P.2d 79, Judge Monarch therefore entered judgment in the amount of $0.00 "upon the parties' stipulation intended solely to facilitate immediate review of that critical issue of law by the Court of Appeal."[7]

DISCUSSION
Miller contends "the plain language and legislative history of section 3344 allow for the statutory minimum damage of $750 to be applied to each of Collectors' 14,060 separate unauthorized uses of Miller's name and signature brought in a single lawsuit." He further argues that such damages would be "purely compensatory," and would "not amount to an unlawful penalty ... in violation of due process."
Collectors contends Miller's interpretation of section 3344(a) "is not supported by the law or common sense and would result in a windfall of unprecedented proportions," especially in light of Miller's election not to prove any actual damages. According to Collectors, "the plain language of the statute, rules of statutory construction, references to copyright and trademark statutory construction, as well as the case law on point, legislative history, and the California jury instruction related to section 3344(a) all point to the conclusion that [the statute] entitles plaintiffs in Miller's position to obtain a single award of $750, plus disgorged profits, punitive damages and attorneys' fees." Alternatively, Collectors argues that if we interpret "section 3344(a) to permit Miller to use the $750 minimum statutory damages provision as a multiplier, ... such an application of the statute to this case would result in an unconstitutional award."
We address these contentions in the second part of this opinion, examining whether section 3344(a) entitles Miller to recover a single award of $750 for the misappropriation of his name, or instead, statutory damages of $10,545,000 calculated at $750 per unauthorized COA. But first, in the initial part of this opinion, we discuss the single-publication rulewhich under certain circumstances limits a plaintiff to a single tort cause of action for multiple copies of a harmful publicationand the reason why the rule does not apply to this case.

The Single-Publication Rule Does Not Limit Miller to a Single Cause of Action Under the Facts of This Case
In its briefing, Collectors refers to the 14,060 certificates of authentication as "copies" of one another, thus implying that the certificates are all exact duplicates. Miller suggests Collectors' phraseology adopts, sub silentio, the single-publication rule, under which a plaintiff has a single tort cause of action "founded upon any single publication ..., such as any one issue of a newspaper or book or magazine...." (Civ.Code, § 3425.3.) Miller goes on to argue that the single-publication rule does not apply to the instant facts, principally because each COA had a different serial number and authenticated a separate item for a separate customer. Miller *357 is tilting at a windmill, however, for Collectors agrees the single-publication rule is inapplicable here, but for a different reason: Collectors posits the single-publication rule involves "publications" whereas Miller's section 3344(a) claim involves "infringements." Because the parties agree the single-publication rule is not helpful here, and we agree with that conclusion, we could have moved on with our analysis without further discussion of the rule. But the rule has such an obvious potential application, we explain briefly why we conclude it is not applicable to the facts of this case.
Prior to the adoption of the single-publication rule, "the principle that each communication of a defamatory remark to a new audience constitutes a separate `publication,' giving rise to a separate cause of action, led to the conclusion that each sale or delivery of a copy of a newspaper or book containing a defamation also constitutes a separate publication of the defamation to a new audience, giving rise to a separate cause of action for defamation. [Citations.] This conclusion had the potential to subject the publishers of books and newspapers to lawsuits stating hundreds, thousands, or even millions of causes of action for a single issue of a periodical or edition of a book. This conclusion also had the potential to disturb the repose that the statute of limitations ordinarily would afford, because a new publication of the defamation could occur if a copy of the newspaper or book were preserved for many years and then came into the hands of a new reader who had not discovered it previously. The statute of limitations could be tolled indefinitely, perhaps forever, under this approach." (Shively v. Bozanich (2003) 31 Cal.4th 1230, 1243-1244, 7 Cal.Rptr.3d 576, 80 P.3d 676 (Shively).)
"Seeking to avoid both the multiplicity and the staleness of claims ..., courts fashioned what became known as the single-publication rule, holding that, for any single edition of a newspaper or book, there was but a single potential action for a defamatory statement contained in the newspaper or book, no matter how many copies of the newspaper or the book were distributed." (Shively, supra, 31 Cal.4th at p. 1245, 7 Cal.Rptr.3d 576, 80 P.3d 676.) "The single-publication rule largely has been codified in the Uniform Single Publication Act, which has been adopted in many states, including California." (Id. at p. 1246, 7 Cal.Rptr.3d 576, 80 P.3d 676.) The California statute provides: "No person shall have more than one cause of action for damages for libel or slander or invasion of privacy or any other tort founded upon any single publication or exhibition or utterance, such as any one issue of a newspaper or book or magazine or any one presentation to an audience or any one broadcast over radio or television or any one exhibition of a motion picture. Recovery in any action shall include all damages for any such tort suffered by the plaintiff in all jurisdictions." (Civ.Code, § 3425.3.) Notwithstanding the single-publication rule, "a new edition or new issue of a newspaper or book still constitutes a new publication, giving rise to a new and separate cause of action...." (Shively, supra, 31 Cal.4th at p. 1245, fn. 7, 7 Cal.Rptr.3d 576, 80 P.3d 676.)
The purpose of the single-publication rule is apparent, both from its history and from the language of the California statute implementing it. The rule is directed at mass communications, such as communications in newspapers, books, magazines, radio and television broadcasts, and speeches to an audience. Where the offending language is read or heard by a large audience, the rule limits the plaintiff to a single cause of action for each mass communication.[8] *358 A separate cause of action for each member of the public audience is disallowed. Confusingly, it is not always immediately apparent whether each separate mass communication triggers a new cause of action. Although the rule is "founded upon any single publication or exhibition or utterance, such as any one issue of a newspaper or book or magazine or any one presentation to an audience or any one broadcast over radio or television or any one exhibition of a motion picture" (Civ. Code, § 3425.3, italics added), in California it nevertheless has been held that six different editions of a newspaper, all dated on the same date but distributed over two days, constitute one issue of the newspaper for purposes of the single-publication rule. (Belli v. Roberts Brothers Furs (1966) 240 Cal.App.2d 284, 289-290, 49 Cal.Rptr. 625 [court relied on Legislature's choice of the word "issue" rather than the word "edition," when adopting and modifying the Uniform Single Publication Act, as evidencing legislative intent to create a distinction between the two words].) On the other hand, publication of a paperback edition of a book previously published as a hardback constitutes a new cause of action under the single-publication rule. (Kanarek v. Bugliosi (1980) 108 Cal.App.3d 327, 333, 166 Cal.Rptr. 526.) But despite these nuances as to whether a republication triggers a new cause of action, the words "publication or exhibition or utterance" must continue to mean a mass communication to a large audience, whether by writing, displaying, or speaking. Otherwise, the rule would serve a purpose beyond that for which the rule was originally intended.
We recognize and agree with the court's analysis in the recent case of Christoff v. Nestle USA Inc. (2007) 152 Cal. App.4th 1439, 62 Cal.Rptr.3d 122, which held, inter alia, that "the single-publication rule applies to a cause of action under section 3344," (id. at p. 1444, 62 Cal. Rptr.3d 122),[9] but we further observe the court's statement was in the context of determining whether a cause of action under section 3344(a) is the type of claim intended to be addressed by the rule. The Christoff court was not called upon to consider whether the single-publication rule had any application to a section 3344(a) claim that did not arise from a mass communication.
Here, the evidence showed Collectors distributed over 14,000 COA's authenticating separate items for different third parties over the course of three months. The evidence does not establish that any COA was issued or directed to a mass audience. *359 Instead, individual COA's were issued to separate individuals to authenticate separate items. Although the COA's were identical except for an individual serial number, the purchaser of the certificate could use that serial number to access a description of the corresponding authenticated article on Collectors' website. Because Collectors' conduct involved a series of separate transactions rather than a mass communication or display of an identical content, we hold the single-publication rule does not apply to the series of separate transactions shown by the evidence and thus does not, by itself, limit Miller to a single cause of action.

Interpretation of Section 3344(a)
Having concluded the single-publication rule does not assist our resolution of this case, we turn to the interpretation of section 3344(a) and the application of the statute to this case. We begin with a brief discussion of the appropriate standard of review and general principles of statutory construction. Where the relevant facts are undisputed, the interpretation and application of a statute presents a question of law subject to de novo review. (International Engine Parts, Inc. v. Feddersen & Co. (1995) 9 Cal.4th 606, 611, 38 Cal. Rptr.2d 150, 888 P.2d 1279; People ex rel. Lockyer v. Shamrock Foods Co. (2000) 24 Cal.4th 415, 432, 101 Cal.Rptr.2d 200, 11 P.3d 956.) In independently construing a statute, we strive to ascertain the lawmakers' intent "so as to effectuate the purpose of the statute." (Day v. City of Fontana (2001) 25 Cal.4th 268, 272, 105 Cal.Rptr.2d 457, 19 P.3d 1196.) We look first to the "plain meaning" of the statute's words, and only if the language is ambiguous do we resort to extrinsic aids such as legislative history. (Ibid.) Our role is "not to insert what has been omitted, or to omit what has been inserted" (Code Civ. Proc., § 1858); therefore, we may add to or alter a statute's words only when necessary to accomplish a purpose apparent on the statute's face or from its legislative history. (Burden v. Snowden (1992) 2 Cal.4th 556, 562, 7 Cal.Rptr.2d 531, 828 P.2d 672.) Where possible, we construe the statute "so as to avoid absurd or unreasonable results" (Shephard v. Loyola Marymount Univ. (2002) 102 Cal.App.4th 837, 846, 125 Cal.Rptr.2d 829) and "to preserve its constitutionality" (Dyna-Med, Inc. v. Fair Employment & Housing Com. (1987) 43 Cal.3d 1379, 1387, 241 Cal.Rptr. 67, 743 P.2d 1323).
With these precepts in mind, we recite the language of section 3344(a): "Any person who knowingly uses another's name ..., in any manner, on or in products, merchandise, or goods, or for purposes of ... selling, or soliciting purchases of, products, merchandise, goods or services, without such person's prior consent ... shall be liable for any damages sustained by the person ... injured as a result thereof. In addition, in any action brought under this section, the person who violated the section shall be liable to the injured party ... in an amount equal to the greater of seven hundred fifty dollars ($750) or the actual damages suffered by him ... as a result of the unauthorized use, and any profits from the unauthorized use.... Punitive damages may also be awarded to the injured party.... [¶] The prevailing party in any action under this section shall also be entitled to attorney's fees and costs." [10] (Italics added.)
Both Miller and Collectors reasonably contend the statute's language supports their respective interpretations. In the absence of proof of actual damage, the *360 statute can be read to limit Miller to a $750 award (aside from disgorged profits, punitive damages and attorney fees and costs) in this single lawsuit or from the single unauthorized use of his name. But the statute can also be interpreted to entitle Miller to a $750 award for each unauthorized use of his name on a product or for purposes of selling a product or service. In other words, section 3344(a) is ambiguous in this respect. Although Collectors strenuously argues the statute's plain language does not support the use of the "$750 minimum damage provision as a per-copy multiplier," its characterization of the COA's as "copies" of one another inaccurately connotes identical copies. The COA's were not identical, as each represented a separate and distinct authenticated item, bore an individual serial number, and was issued to a distinct customer.
Each party also argues that the opposition's interpretation would lead to unreasonable results. Miller asserts that to cap Collectors' liability at $750an insignificant "cost of doing business"is unreasonable, especially "because Collectors violated the statute on an astronomical scale." He further claims $750 in damages is tantamount to nominal damages or no damages at all. (See Fairfield v. American Photocopy Etc. Co. (1955) 138 Cal.App.2d 82, 87-88, 291 P.2d 194 (Fairfield) [pre-section 3344 case involving common law misappropriation of name and stating nominal damages "involve a trivial sum" and are "the same as no damages at all"].) Collectors, on the other hand, contends that if section 3344(a) entitled plaintiffs to statutory damages of $750 for each "copy," plaintiffs would never "bother to prove ... actual damages." Collectors points out that section 3344(a) does not limit plaintiffs to arguably nominal damages since the statute provides for the recovery of actual damages, punitive damages, and the disgorgement of defendant's profits.
The case law on this issue is limited. The parties refer us to two federal cases in which plaintiffs recovered statutory damages under section 3344(a). (IO Group, Inc. v. Adkins (N.D.Cal. June 23, 2005, No. C04-819) 2005 WL 1492381 (IO Group); Perfect 10, Inc. v. Talisman Communications, Inc. (C.D.Cal. Mar. 27, 2000, No. CV99-10450) 2000 WL 364813 (Perfect 10).) But these cases are unhelpful, as each opinion was issued in support of a default judgment, i.e., without opposition.[11] Without an adversary process to sharpen the debate, these courts arrived at their conclusions with an incomplete recitation of facts and scant legal analysis.
In IO Group, supra, 2005 WL 1492381, a number of models had assigned their right of publicity to the plaintiff. (Id. at p. 7.) A total of 101 photographs were appropriated by defendant, but the opinion does not state whether photographs of 101 different models were appropriated or whether defendant appropriated multiple photographs of fewer models. Nevertheless, without further explanation, and in addition to copyright infringement damages, the plaintiff *361 assignee was awarded $750 for each of the 101 misappropriated photographs for a total of $75,750 in section 3344(a) statutory damages. (10 Group, at pp. 1, 7.) Without more, we cannot determine whether the publicity rights of 101 different persons were appropriated (101 causes of action) or whether the likenesses of fewer models were appropriated but the court adopted a "per photograph" analysis similar to that urged here by Miller.
In Perfect 10, supra, 2000 WL 364813, the plaintiff was likewise the assignee of the publicity rights of four models. Six photographs of four models were misappropriated. In addition to copyright infringement damages, the plaintiff was awarded $750 for each of the four models (in six misappropriated photographs) for a total of $3,000 in section 3344(a) statutory damages; in other words, the plaintiff was not awarded $750 per photograph. (Id. at pp. 1, 4-5.) But the opinion does not tell us whether any of the photographs were duplicates, and the court does not engage in any legal analysis in support of its decision. Thus IO Group and Perfect 10 do not assist us in interpreting section 3344(a) to resolve the issue at hand.
We turn to the statute's legislative history. Both parties argue the 1984 amendments to section 3344(a)allowing a plaintiff to recover punitive damages and the defendant's disgorged profitssupport their respective positions. Collectors contends the Legislature, by making punitive damages available, "removed any plausible argument that the plaintiff could use the $750 minimum as a punitive multiplier." Miller, on the other hand, argues the Legislature, by raising the minimum recovery from $300 to $750 and authorizing punitive damages, profits, attorney fees and costs, intended "to further expand protections for celebrity and non-celebrity plaintiffs alike." Again, both parties have a plausible argument, so we must search further for an answer.
The statute's legislative history reveals section 3344(a) was intended to fill "a gap which exist[ed] in the common law tort of invasion of privacy" as applied to noncelebrity plaintiffs whose names lacked "commercial value on the open market." (Assemblymember Vasconcellos, Letter to Gov. Reagan, Nov. 10,1971 re Assem. Bill No. 826 (1971 Reg. Sess.) p. 1.) Unlike an entertainment or sports star, non-celebrity plaintiffs often could not prove damages under the common law; therefore, section 3344(a) as originally enacted in 1971 "established a concrete remedy for the little man with a minimum of $300 payment," "a simple, civil remedy for the injured individual."[12] (Letter to Gov. Reagan, supra, at pp. 1-2.) A legislative analysis of the bill quotes the following passage from Fairfield, supra, 138 Cal.App.2d at p. 86-87, 291 P.2d 194: "Unlike [an] action for defamation, `The gist of the cause of action in a privacy case is not injury to the character or reputation, but a direct wrong of a personal character resulting in injury to the feelings without regard to any effect which the publication may have on the property, business, pecuniary interest, or the standing of the individual in the community.... The right of privacy concerns one's own peace of mind, while the right of freedom from defamation concerns primarily one's reputation.... The injury is mental and subjective. It impairs the mental peace and comfort of the person and may cause suffering much more acute than that caused by a bodily injury...."' (Assem. Com. on Judiciary, Analysis of Assem. *362 BUI No. 826 (1971 Reg. Sess.), June 14, 1971, p. 1.) Thus, by enacting section 3344(a), the Legislature provided a practical remedy for a non-celebrity plaintiff whose damages are difficult to prove and who suffers primarily mental harm from the commercial misappropriation of his or her name.
Miller relies heavily on this purpose, and as further support for his interpretation of section 3344(a), refers us to a 1977 Legislative Counsel's opinion interpreting the statute to authorize statutory minimum damages for each prohibited use. Specifically, the opinion states the minimum recovery is "authorized per each use irrespective of whether the prohibited uses are established in separate actions or in a single action in which more than one cause of action is permissively joined or required by the court to be consolidated." (Ops. Cal. Legis. Counsel, No. 16283 (Nov. 8, 1977) Use of Another's Likeness, p. A-12 (Legislative Counsel's Opinion); see California Assn. of Psychology Providers v. Rank (1990) 51 Cal.3d 1, 17, 270 Cal.Rptr. 796, 793 P.2d 2 [Opinions of Legislative Counsel may be considered when construing a statute].)[13] The opinion's "[analysis" states in pertinent part: "[A]ssuming the existence of more than a single publication or exhibition or utterance constituting a prohibited use under Section 3344, a person injured by such use would be entitled to the $300 minimum as to each separate action filed in which a violation is proven. [¶] Likewise, in our opinion the same result would obtain with respect to an action in which more than one cause of action is joined or consolidated pursuant to Section 427.10 or 1048 of the Code of Civil Procedure. Otherwise, to construe the term `action' so as to authorize an award of $300, as a minimum, only as to separately filed causes of action would be to ignore the practical, and give meaning to the technical, sense of such term." (Legislative Counsel's Opinion, supra, at p. A-13.)
As foreshadowed by Legislative Counsel's use of the phrase "single publication or exhibition or utterance," the analysis also discusses the single-publication rule: "Further, Section 3344 would be construed in light of Section 3425.3 of the Civil Code, which prohibits the splitting of a cause of action founded upon a single publication or exhibition or utterance. Thus, a plaintiff suing under Section 3344 would have only one cause of action for damages founded upon any single publication, exhibition, utterance, such as one issue of a newspaper or magazine or any one presentation to an audience or any one broadcast over radio or television.... While Section 3344 subjects a person to liability for an unauthorized 'use,' and Section 3425.3 is phrased in terms of a `publication or exhibition or utterance,' the terms are sufficiently similar as to have virtually identical meanings within the context of the question presented." (Legislative Counsel's Opinion, supra, at p. A-13.) Thus, the opinion implicitly equates the word "use" with "cause of action," and recognizes that in the case of a mass communication to which the single-publication rule applies, only a single "use," i.e., a single cause of action, would arise out of a single mass distribution by publication, exhibition or utterance, no matter the size of the audience.
*363 This brings us to the basic question of whether Miller could have stated 14,060 causes of action in this case. Miller contends he could have brought 14,060 lawsuits, but that it would be absurd to interpret the statute to require such a wasteful enterprise "where numerous `unauthorized uses' are alleged...." Miller assumes that the issuance of each COA without his consent was a separate "unauthorized use" constituting a separate cause of action. As discussed below, that assumption is unwarranted.
We turn to "the primary right theory utilized in California to determine whether causes of action are identical. [In this case, whether the issuance of each successive COA generated a separate cause of action.] `California follows the primary right theory of Pomeroy; i.e., a cause of action consists of 1) a primary right possessed by the plaintiff, 2) a corresponding primary duty devolving upon the defendant, and 3) a delict or wrong done by the defendant which consists in a breach of such primary right and duty. [Citation.] Thus, two actions constitute a single cause of action if they both affect the same primary right.'" (.Richard B. LeVine, Inc. v. Higashi (2005) 131 Cal. App.4th 566, 575, 32 Cal.Rptr.3d 244.) We note the primary right theory "has been criticized on the ground that the term 'primary right' is not of fixed meaning, but may be broadly or narrowly interpreted." (4 Witkin, Cal. Procedure (4th ed. 1997) Pleading, § 25, p. 86.) Nonetheless, the idea that "[t]he cause of action is based upon the injury to the plaintiff" (id. at § 26 p. 88), provides parameters useful in determining whether a plaintiff has violated the rule against splitting a single cause of action. (Id at § 35, p. 95.)
Here, the harm Miller suffered, and which section 3344(a)'s minimum statutory damages were intended to remedy, was the alleged injury to his mental feelings and peace of mind, as elucidated in Fairfield, supra, 138 Cal.App.2d at pages 86-87, 291 P.2d 194. As further explained in Dora v. Frontline Video, Inc. (1993) 15 Cal.App.4th 536, 18 Cal.Rptr.2d 790, misappropriation has two aspects: (1) the right of publicity protecting the commercial value of celebrities' names and likenesses, and (2) "the appropriation of the name and likeness that brings injury to the feelings, that concerns one's own peace of mind, and that is mental and subjective." (Id. at pp. 541-542, 18 Cal.Rptr.2d 790.) In making his case on appeal for recovering statutory damages, Miller discusses Fairfield at length and the difficulty of proving mental harm caused by name misappropriation.
He also asserts, however, that the two aspects of misappropriation (appropriation of commercial value as opposed to injury to feelings) are "not necessarily" mutually exclusive. Thus, he also alleges he suffered commercial loss from the dilution of the value of his future authentications, and damage to his professional reputation because his name is forever tied to 14,060 items which may be "traded in the commercial marketplace over and over again" and may be of questionable authenticity. He characterizes these losses as "difficult (if not impossible) to quantify and prove." But the legislative history of section 3344(a) reveals the statutory minimum damages were meant to compensate noncelebrity plaintiffs who suffer the Fairfield form of mental anguish yet no discernible commercial loss. To the extent Miller suffered commercial loss due to his status as an authenticator well-known and respected in "the close-knit autograph and collectibles industry," his recourse was to prove actual damages like any other plaintiff *364 whose name has commercial value.[14] We conclude the primary right protected by section 3344(a)'s provision for statutory minimum damages is the right to be free from the Fairfield form of mental anguish resulting from commercial misappropriation.
But we must still decide whether Miller suffered a new violation of his primary right with each new COA, i.e. "separate wrongs" (4 Witkin, Cal. Procedure, supra, Pleading, § 40, p. 100), such as to constitute 14,060 causes of action. Our decision is informed by those cases that have considered whether a series of related acts, having a common purpose or committed pursuant to a common plan or scheme, but resulting in the same injury or harm, give rise to a single cause or multiple causes of action. Although the cases we look to for guidance did not involve section 3344(a), the courts' analyses are nevertheless apt to the issue at handwhether a series of related acts causing the same injury or harm gives rise to more than one cause of action.
Thus, in Conger v. White (1945) 69 Cal. App.2d 28, 158 P.2d 415, the plaintiff alleged she was the victim of a conspiracy to defraud her in connection with the purchase and sale of three separate parcels of real property. (Id. at pp. 30, 41, 158 P.2d 415.) "All of the acts of defendants were alleged to have been done in pursuance of this common purpose and design. The same representations were relied upon as a basis of the charges of fraud in each" of three sales of real property. (Id. at p. 41, 158 P.2d 415.) Despite the fact plaintiff had been defrauded in three separate property transactions, the court held that the "series of fraudulent acts committed in the execution of an entire scheme to divest plaintiff of [her] property states a single cause of action." (Ibid.)
In Tooke v. Allen (1948) 85 Cal.App.2d 230, 192 P.2d 804, the defendant landlord committed a series of wrongful acts against his tenant including failing "to furnish adequate telephone, gas, water, and electric service," "taking and [detaining] plaintiffs clothing and other personal belongings," and "locking plaintiff out and invading her apartment and committing ... assaults." (Id. at p. 234, 192 P.2d 804.) The landlord asserted plaintiffs complaint improperly joined multiple causes of action: "unlawful detention of personal property," "personal injuries," "injury to property," "eviction," and "nuisance." (Ibid.) But the court held the tenant's right of peaceful possession was the primary right violated by the landlord's conduct. Noting the gravamen of defendant's offense was "the pursuit of a purpose of unrelenting persecution by petty annoyances," the court held that despite the series of different acts, only a single cause of action was stated for the interference with plaintiffs right of peaceful possession. (Id. at p. 236, 192 P.2d 804, italics added.)
Similarly, in Oppenheimer v. City of Los Angeles (1951) 104 Cal.App.2d 551, 232 P.2d 30, plaintiff alleged he was wrongfully jailed, and while falsely imprisoned, his jailers assaulted and starved him. (Id. at p. 552, 232 P.2d 30.) The court held the allegations of assault were "`only an "aggravating fact" or circumstance attending the defendant's commission of the one cause of action ... of false imprisonment,' " and did not constitute a separate *365 cause of action. (Id. at p. 553, 232 P.2d 30.)
In Bay Cities Paving & Grading, Inc. v. Lawyers' Mutual Ins. Co. (1993) 5 Cal.4th 854, 21 Cal.Rptr.2d 691, 855 P.2d 1263, the court construed the meaning of the word "claim" in a legal malpractice insurance policy. Acknowledging the primary rights theory was not controlling, the high court nevertheless found it "illustrative." Thus the high court began its analysis of the coverage issue by noting the plaintiff "was not asserting two causes of action. [Plaintiff] had a single injury and thus a single cause of action against its attorney." (Id. at p. 860, 21 Cal.Rptr.2d 691, 855 P.2d 1263.) Plaintiffs right to be free of negligence by its attorney was allegedly breached in two different ways, but nevertheless remained a single right constituting a single cause of action. (Ibid.)
Finally, in another fraud case, Sterner v. Williams (1996) 46 Cal.App.4th 986, 54 Cal.Rptr.2d 243, the defendant was charged with committing seven separate fraudulent acts. (Id. at p. 993-994, 54 Cal.Rptr.2d 243.) In the context of determining whether the trial court erred in not requiring the jury "to agree on the same fraudulent act provided at least nine jurors agreed that all of the elements of fraud were proved by a preponderance of the evidence" (id. at p. 990, 54 Cal.Rptr.2d 243), the court held only a single cause of action was stated despite "multiple, alternative fraudulent acts...." (Id. at p. 1004, 54 Cal.Rptr.2d 243.)
Here, 14,060 COA's were issued to authenticate 14,060 separate items. But they were all issued for a common purpose pursuant to a common plan: to use Miller's name as a member of the panel of authentication experts. The separate COA's were related to each other by this common purpose and plan. The COA's were printed at the same timeonly the serial numbers were differentand they were issued seriatim as authentication services were purchased by the customers. Miller's injury, the worry and uncertainty regarding his reputation and his potential liability for improperly authenticated items, occurred when Collectors' knowingly issued its first COA without his prior consent. The number of COA's issued may be relevant to his actual damages, if any, and to punitive damages. But with regard to his statutory damages, the issuance of subsequent improper COA's did not give rise to new causes of action.
In sum, Miller's claim against Collectors for the misappropriation of his name under section 3344(a) constitutes a single cause of action for which his statutory damages are $750. Since we have decided this case based on our interpretation and application of the statute that limits Miller to a single section 3344(a) cause of action for his actual damages or statutory damages of $750, whichever is greater, we do not address the parties' alternative contentions regarding whether an award of over 10 million dollars would constitute an unconstitutional penalty.

DISPOSITION
In phase one of the bifurcated trial, the court interpreted section 3344(a) to allow $750 in statutory damages for each unauthorized COA. With that ruling in hand, Miller proceeded to dismiss his common law invasion of privacy claim and his prayer for punitive damages, and to try this case without attempting to introduce evidence of actual damages. Under these circumstances, we reverse the judgment for a retrial of the entire complaint. The stipulation for judgment on the cross-complaint is not affected by our decision. The court is directed to reinstate Miller's common law invasion of privacy Claim and his prayer for punitive damages so that he *366 may proceed on those matters if he chooses to do so in addition to his section 3344(a) claim. Collectors shall recover its costs on appeal.
WE CONCUR: RYLAARSDAM, Acting P.J., and O'LEARY, J.
NOTES
[1] Miller's share of the purchase price was $445,000.
[2] Miller's unopposed motion pursuant to California Rules of Court, rule 8.224(c), to transmit trial exhibits 165, 166, and 168 to this court is granted. These exhibits are illustrative examples of certificates of authenticity.
[3] Pursuant to the employment contract, Collectors paid Miller a total of $750,000 in compensation for the five-year period.
[4] At trial the PSA/DNA president testified Miller never authenticated any autographs on the company's behalf.
[5] In April, Collectors had ordered a printing of certificates of authenticity without Miller's name, but the certificates did not arrive before his termination.
[6] In his closing statement, Miller's counsel asked the jury to award Miller $1 in profit for each COA issued by Collectors without his consent.
[7] The court also awarded Miller $14,060 for profits Collectors made from the unauthorized use of his name. On the cross-complaint, the court awarded Collectors $4,812.50 under Miller's 2002 promissory note to Collectors, and $33,000 for money Collectors advanced to Miller in 2001. The court deferred naming the prevailing party.
[8] The Shively court declined to rule on the "applicability of the single-publication rule to written publications that receive an extremely limited distribution," stating it was "not an issue in the present case." (Shively, supra, 31 Cal.4th at p. 1245, fn. 6, 7 Cal.Rptr.3d 576, 80 P.3d 676.)
[9] The Christoff court traced the history of the tort of appropriation and concluded it derived from the common law tort of invasion of privacy. Inter alia, the court reasoned the plain language of Civil Code section 3425.3 which applies the single-publication rule both to an "invasion of privacy" and "any other tort," compels the conclusion that Civil Code section 3344 actions must be analyzed under the single-publication rule. We add to the analysis of the Christoff court by noting that during the 1971 process of enacting Civil Code section 3344, the Legislature sought to limit the single-publication rule's application to section 3344(a). The original assembly bill that added section 3344 to the Civil Code also amended Civil Code section 3425.3 (the single-publication rule) to read: "Except as provided by subdivision (a) of Section 3344, no person shall have more than one cause of action for damages...." (Assem. Amend, to Assem. Bill No. 826 (1971 Reg. Sess.) June 16, 1971, italics added.) Subsequently, the bill was amended to add section 3344 only and not to amend Civil Code section 3425.3.
[10] We omit the statute's reference to the use of another's signature since the jury found only that Collectors used Miller's name without his consent.
[11] These federal decisions on matters of California law, "although entitled to respect and careful consideration, [are not] binding or conclusive on the courts of this state." (Bank of Italy Etc. Assn. v. Bentley (1933) 217 Cal. 644, 653, 20 P.2d 940.) Collectors also relies on a Nevada case, Hetter v. District Court (1994) 110 Nev. 513, 874 P.2d 762 (Hetter), where a court interpreted a Nevada statute similar to section 3344(a) to limit a plastic surgery patient to recovery of $750 for the misappropriation in a brochure of "her before-and-after pictures," rather than $750 for each person "who saw her picture" in the brochure. (Id. at pp. 763, 765.) Miller argues Hetter in effect applies the single-publication rule to limit the plaintiff's recovery, without using those express words, and we agree.
[12] The 1984 amendment of Civil Code section 3344 increased the minimum damages from $300 to $750. (Stats. 1984, ch. 1704.)
[13] While consideration of the Legislative Counsel's opinion is appropriate, we give this particular opinion limited weight. The opinion was issued in 1977 in response to a question from assemblymember John Vasconcellos, the author of the bill enacting Civil Code section 3344. We have no evidence that the opinion, issued six years after Civil Code section 3344 was adopted, was ever considered by the Legislature as a whole in connection with any proposed legislation, and the statute was not amended again until 1984, seven years later.
[14] A plaintiffs knowledge of possible commercial loss and/or defamation may be a component of mental harm, disturbing one's peace of mind. "[T]he fact that several distinct elements of damage are alleged by the single plaintiff [does not] make it more than one cause." (4 Witkin, Cal. Procedure, supra, Pleading, § 39, p. 99.)